UNITED STATES of America,
Plaintiff-Appellee,

v.

Elias MONTOYA–CAMACHO,
Defendant-Appellant.

No. 80–1043.

United States Court of Appeals,
Fifth Circuit.
Unit A

May 6, 1981.

Alonzo Villarreal, Jr. (court-appointed), Uvalde, Tex., for defendant-appellant.

Jamie C. Boyd, U.S. Atty., LeRoy Morgan Jahn, San Antonio, Tex., for plaintiff-appellee.

Before BROWN, WISDOM and RANDALL, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Defendant, Elias Montoya-Camacho (Montoya), appeals District Court's judgment of conviction on acceptance of his guilty plea for conspiracy to transport aliens illegally within the United States in violation of 18 U.S.C. § 371. Although Montoya challenges only adequacy of the factual basis for his plea, the argument on appeal concentrated largely on whether his plea was voluntarily and knowingly made. Concluding both of these requisites were met before the plea was accepted, we affirm his conviction.

*Pleas of Innocence and Guilt*

During the early morning hours of October 11, 1979, Montoya, Francisco Javier Cordero-Perez (Cordero), and approximately thirty aliens were apprehended by United States Border Patrolmen after crossing the Chihuahua area of the Rio Grande River in Del Rio, Texas. For his participation, Montoya was charged by a five-count indictment with one count of conspiracy to transport aliens in violation of 18 U.S.C. § 371, and four counts of actually bringing aliens illegally into the United States in violation of 8 U.S.C. § 1324(a)(1). He originally entered a plea of not guilty to the indictment. Two weeks later, however, Montoya was rearraigned, at which time, along with Cordero, he pleaded guilty to count one in exchange for a plea agreement dismissing the remaining four counts of the indictment.

Before accepting the plea, District Court meticulously explained to Montoya and Cordero through an interpreter both the charges and consequences of their guilty pleas. In eliciting their answers the Court carefully addressed each separately and each gave separate answers. Initially, District Court set out how they were each charged with the violation of two separate laws—one for committing the act and the other for conspiring together.[1] During this

---

1. In this regard, District Court read each section of law to Montoya and Cordero, emphasizing which law they were charged with in each specific count of the five-count indictment:

THE COURT: Under our law, it is against the law in certain cases to agree to violate the law, violate a law. For example, it is against the law to conspire to rob a bank. Again, it is against the law to rob a bank. That's two separate offenses. To agree to get together and become partners to agree to violate a law is one violation and to actually do it is another violation.

Actually to do the thing that you conspire to do is another violation.

Now, you are not charged here with conspiring to rob a bank or actually robbing a bank. I use that only to illustrate for you to understand what you are charged with here. For example, here we have a law that it is illegal for you to transport aliens. That's one law. That's like in the illustration actually robbing the bank: it is illegal for you to transport aliens that are

procedure, District Court specifically defined what was meant by conspiracy to

illegally in the United States and it is illegal for you to agree to violate that law, just as it would be illegal to conspire to rob that bank.

In count number two you are charged with conspiring to illegally transport aliens.

To show you what I mean by the two separate laws in your case, I am going to ask the prosecutor to give me a copy of the two laws that I am talking about as they apply to you. I have furnished to your attorneys a picture copy of the law that you are charged with having violated as a conspirator.

This applies—this law is referred to in the charge in count number one as 18 USC, Section 371.

I will read you the relevant parts and I quote: "If two or more persons conspire either to commit any offense against the United States or any agency thereof in any manner or for any purpose and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

\* \* \* \* \* \*

Now I am going to read you—I read you the law that says it is against the law to conspire to violate a law. I have read that to you first, do you remember?

INTERPRETER: They both state, "yes", Your Honor.

THE COURT: I am going to read you the law that you conspired to violate. I will just read you the part that applies.

"Any person, including the owner, operator, agent of any means of transportation, who knowing that he—which means an alien—is in the United States in violation of law and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than three years prior thereto, transports, or moves or attempts to transport or move within the United States by means of transportation or otherwise, in furtherance of such violation of law, any alien, or aliens not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this chapter or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs."

\* \* \* \* \* \*

THE COURT: Now, that is the law in which each of you are charged, that was used; that is the basis of the charges contained in counts two, three, four, and five against you.

assure Montoya and Cordero understood Count One.[2] When individually questioned

Simply stated, count number one charges you with conspiring to violate counts two, three, four and five. . . .
The other charges—counts two, three, four and five charge you with violating this law. I will read that to you. Subsection (a)(1):
Any person, including the owner, operator, agent, who brings into or lands in the United States by any means of transportation or otherwise, or attempts by himself or through another to bring into or land in the United States by any means of transportation or otherwise, any alien not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under this law or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding five years, or both, for each alien in respect to whom any violation of this subsection occurs.
So the count one charges you with conspiring or agreeing to more or attempt to transport or move aliens, but counts two, three, four and five charges you with the attempting to bring them in, which is different from the charge of conspiring to transport them.

In other words, count one charges you with conspiring to walk the aliens into the United States, and the count one does not charge you with illegally transporting or moving them by vehicle or in the vehicle.

I am only explaining the difference to you so you will know that counts two, three, four and five charge entirely different offenses and they are the ones that under the plea agreement, as I understand it, that you will be dismissed at the time of sentencing if your plea is accepted and the punishments that apply to counts two, three, four and five are only explained to you for information. They apply to those counts only, which is different from count number one.

2. District Court compared a conspiracy to acting in a partnership:
THE COURT: So that you will understand that count number one a little bit better, I want to explain to you that in law that means that you two are charged with acting together in a kind of a partnership, in this criminal enterprise, this criminal effort. It means that you combined or agreed together in some way to each have a part in disobeying or disregarding the law as related to bringing in or walking in illegally wetbacks or aliens into the United States. That is count number one and that that happened on or about from October 9, through October 11, 1979, in the Western District of Texas.

by District Court, each acknowledged he had discussed the charges with his attorney. District Court then articulated the elements of the crime the Government had to prove before a jury if either wished to plead not guilty.[3]

3. The elements of the crime charged in Count One were explained in relation to the facts of the crime:

THE COURT: Well, if you plead not guilty, if you should plead not guilty and have a jury trial, the court would tell the jury that this is the law; that before the Government, the United States of America, could convict you of this charge in count number one, the Government would have to prove four essential elements about that charge, four things: That the conspiracy with which you are charged in count number one was formed and continued on or about the time as alleged, as is stated in count number one, and that it occurred here in the Western District of Texas, that is, either Maverick or Kinney Counties, Texas. In other words, that it happened on or about October 9 and continued until on or about October 11, 1979, the exact date is not important; just so it is reasonably within that time.

Second, the Government would have to prove that each of you knowingly and willfully was a member of that conspiracy, that is, you were a member of that partnership of acting together and that one of you at least knowingly committed at least one of the things charged in that count number one, as overt acts on or about the date alleged and that such overt act was committed in furtherance of the object or purpose of the conspiracy as charged in the indictment.

In other words, you will remember that it was alleged, when count number one was read to you, it said that you, Elias Montoya-Camacho, met with citizens of the Republic of Mexico in Ciudad Acuña, Mexico and discussed the transportation of such aliens in the United States and on or about those same dates; that you, Francisco Javier Cordero-Perez, met with citizens of the Republic of Mexico in Ciudad Acuña, Mexico and discussed the transportation of such aliens in the United States; and that on or about October 10, you, Francisco Javier Cordero-Perez, accompanied a group of Mexican citizens going on the Rio Grande River, in the Republic of Mexico, in preparation for crossing the border into the United States and also that on the next day, October 11, 1979, both of you met with a group of citizens of the Republic of Mexico and crossed the Rio Grande River from the Republic of Mexico into the United States and that you, Mr. Montoya and Cordero-Perez on October 11, 1979, both of you met with a group of citizens of the Republic of Mexico and crossed the Rio Grande River from the Republic of Mexico into the United States and that you, Mr. Montoya and Mr. Cordero, on

Montoya acknowledged he understood the nature of the charge, his possible maximum sentence, his right to be proven guilty at a jury trial, and that he voluntarily wished to plead guilty in exchange for the plea agreement.[4] He further testified he understood

October 11, and a group of citizens of the Republic of Mexico walked from the area of the Rio Grande River to a brushy area near the intersection of Cordelia and Usio Streets in Del Rio, Texas.

Now, if we had a trial, the Government would have to prove at least one, of those things that I told you about here as an overt act and that it was committed by one or the other, or both of you, as a member of this agreement, conspirators.

4. As to the nature of the charge, Montoya was specifically asked:

Do you understand the nature of the charge against you in count number one, Mr. Montoya?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir.

District Court questioned Montoya regarding his possible sentence both in terms of fines and years of imprisonment:

THE COURT: Now, I will read you the law, Mr. Montoya, and what is the highest fine that the court could apply to you if you should be convicted on your plea of guilty—what was the amount?

Can you read figures?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir.

THE COURT: All right. Your attorney will show you the copy of the law that has just been read to you. He will show you the punishment in dollars. What is the most . . .

THE DEFENDANT [Montoya-]CAMACHO: $10,000, Your Honor.

THE COURT: All right. And what is the most you could be imprisoned? For not more than how many years?

Your attorney will show you the law again. If you can't read English, why, of course you will have to confer with him and then you tell me what you understand to be the most, the highest term of imprisonment you can receive.

THE DEFENDANT [Montoya-]CAMACHO: Five years.

THE COURT: Could you get both the fine and imprisonment?

What did the interpreter tell you? Could you get both the fine and the imprisonment?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir, Your Honor.

Montoya knew he was presumed innocent until proven guilty by the Government at trial:

THE COURT: I think I have asked you before, but I want to be sure, do you understand

by admitting guilt to Count One, he was admitting the four essential elements of the crime the Government would have to prove if tried for the offense.[5]

At this point in the proceedings, the Government stated the following facts could be elicited at trial to support Montoya's guilty plea:

> [D]uring the early morning hours of October the 11th at approximately 3:00 a. m. the Border patrolmen talked to these—two of these individuals, Juan Cuevas and Juan Ortiz, who identified themselves as citizens of the Republic of Mexico. The other agents were called into the area and 28 other illegal aliens were apprehended by the Border patrolmen. The aliens gave statements that they were citizens of the Republic of Mexico and not entitled to legal permanent residence in the United States. They stated they had entered the United States illegally and were to be transported to the Dallas-Ft. Worth area. There were 28 men and two women. The aliens stated that they had been recruited in Ciudad Acuña by Mr. Montoya and by Mr. Cordero. The aliens had been given—or stated fees for transporting them anywhere from 200 to $350. The aliens had met either Mr. Montoya or Mr. Cordero around the Plaza at various bars or hotels in Cui-dad Acuña. The aliens were taken to an area on the river in groups of five or six. When the entire group was together, then they all crossed as one group. The aliens were apprehended shortly after crossing the river. At the time of his arrest Mr. Cordero stated to the Border patrolmen that he had met Mr. Montoya in Ciudad Acuña and they had talked about transporting aliens to the Dallas-Ft. Worth area.

> Mr. Cordero further stated that Mr. Montoya had told him that he had some people ready to go to Ft. Worth, Texas, but he needed a driver.

> Mr. Cordero agreed to drive the aliens to Ft. Worth, Texas, and he would also recruit some additional people. Mr. Montoya agreed to furnish the transportation. Mr. Cordero would do the driving.

Mr. Cordero also said that he would collect the money upon arrival in Ft. Worth and return to Ciudad Acuña where the money would be split between Mr. Montoya and Mr. Cordero.

When asked by District Court if he either did or took part in these acts outlined by the Government, Montoya disavowed participation. More specifically, Montoya denied ever speaking to the aliens, accepting any money from them, or being in on this

---

that you each have the right to a jury trial on this count number one?

Mr. Montoya?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir.

\* \* \* \* \* \*

THE COURT: And at this jury trial you would have the right to be represented by your lawyers and their assistants.

Do you understand that at that jury trial you would be presumed innocent until such time, if ever, as the Government established your guilt by competent evidence to the unanimous satisfaction of the jury beyond a reasonable doubt?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir.

District Court repeatedly questioned Montoya concerning the voluntariness of his plea:

Is your plea voluntary, Mr. Montoya?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir, your Honor.

\* \* \* \* \* \*

THE COURT: Has anyone used any force to compel you to plead guilty?

Mr. Montoya-Camacho?

THE DEFENDANT [Montoya-]CAMACHO: No, sir.

\* \* \* \* \* \*

THE COURT: Are you pleading guilty as a result of any physical abuse or threats of any kind, Mr. Montoya-Camacho?

THE DEFENDANT [Montoya-]CAMACHO: No, sir.

5. District Court specifically asked Montoya:

THE COURT: Do you understand that you will be admitting those four essential elements that I told you the government would have to prove if you had a trial under count number one, that your plea of guilty will be admitting those, so that the government will not have to prove them—do you understand that, Mr. Montoya?

THE DEFENDANT [Montoya-]CAMACHO: Yes, sir.

deal with Cordero. Montoya stated he merely met them all at the edge of the river so Cordero could take him to Fort Worth to work.

Montoya's denials also were supported by Cordero. When asked at the Rule 11 hearing regarding Montoya's involvement in the conspiracy, Cordero testified:

Q And you never made any statements to the Border patrolmen that Mr. Montoya—that you had had a conversation with Mr. Montoya in Ciudad Acuña?

A I did have a conversation myself and Elias Montoya, but he did not know. I didn't tell him anything about this business. He didn't know because I did not tell him.

Because of these denials, District Court advised Montoya he was not going to let him plead guilty, stating "[y]ou will just have to stand trial with the jury and I will let the jury decide after they have heard all the evidence whether you are guilty or not." To this decision, Montoya argued, however, "I am guilty because I was with the people." He admitted more than once throughout the proceeding he . had knowledge of the situation when he got to the river. When specifically asked by the Court if he knew he was helping the aliens get across the river and to Fort Worth, Texas, or somewhere else, Montoya replied, "[y]es sir."

District Court then reiterated to Montoya a plea of guilty was a confession of guilt and that by pleading guilty he was admitting all four things necessary to plead a case against him. Again, District Court asked Montoya whether or not he was pleading guilty to Count One to which Montoya replied, "[G]uilty to Count number One, Your Honor." Finally, before accepting this response, District Court explained once more, stating "[T]hat means you admit acts and conduct and participation in this transaction that I have described as Count number One, you admit you participated in it to the extent that you knew that you were violating the law. Now that's what that means." After Montoya acknowledged he had, District Court accepted his affirma-

tive statement under oath he did acts and participated in conduct that made him guilty of the offense. Counsel for Montoya, who also represents him on this appeal, assured District Court Montoya's plea of guilty to Count One was voluntary, accurate, valid, and sufficient for entry of a judgment of conviction.

### A Helping Hand Across the Rio Grande

On appeal Montoya argues that his guilty plea must be set aside because there was not a sufficient factual basis for District Court's acceptance of his plea of guilty as required by F.R.Crim.P. 11(f). He asserts although he denied all specific factual allegations regarding his involvement, District Court accepted his plea based on his affirmative answer to the Court's general legal question whether he had done enough things for which he could be found guilty as charged in Count One. As stated by Montoya in his brief, he "did not admit to any factual allegations, but was simply found guilty on his plea, by reason of his response to a question which was, in reality, a legal question and as such a question left to be answered by the Court." To support his contentions, Montoya cites *United States v. Boatright*, 588 F.2d 471 (5th Cir. 1979), which reversed a defendant's guilty plea because both the indictment and the factual summary read by the prosecutor failed to show facts the defendant agreed with his co-defendants, *id.* at 475–76, and *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969), which required a defendant who is in the position of pleading voluntarily with an understanding of the nature of the charge be protected from entering a plea without realizing his conduct does not actually fall within the charge. *Id.* at 467, 89 S.Ct. at 1171, 22 L.Ed.2d at 425.

▇▇▇ It is well settled in this Circuit, Rule 11 requires a factual basis for each essential element of the crime be shown. *Boatright*, 588 F.2d at 475, *citing United States v. Johnson*, 546 F.2d 1225, 1226 (5th Cir. 1977). *See also United States v. Gearin*, 496 F.2d 691 (5th Cir.), *cert. denied*, 419 U.S. 1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1974). District Court neēd not develop this

from the defendant personally—as long as a factual basis is developed on the record, it may come from several sources. *United States v. King*, 604 F.2d 411, 414 (5th Cir. 1979), *citing Santobello v. New York*, 404 U.S. 257, 261, 92 S.Ct. 495, 498, 30 L.Ed.2d 427, 432 (1971). The indictment may be used for this purpose if it is factually precise and sufficiently specific to show "the accused's conduct on the occasion involved was within the ambit of that defined as criminal." *Sassoon v. United States*, 561 F.2d 1154, 1158 (5th Cir. 1977), *quoting Jimenez v. United States*, 487 F.2d 212, 213 (5th Cir. 1973), *cert. denied*, 416 U.S. 916, 94 S.Ct. 1623, 40 L.Ed.2d 118 (1974). *See also Johnson*, 546 F.2d at 1226. The test to be utilized is based on District Court's subjective satisfaction a factual basis exists for the plea. *United States v. Dayton*, 604 F.2d 931, 938 (5th Cir. 1979) (en banc), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1080, 63 L.Ed.2d 320 (1980).[6] In making its determination, District Court must comply with both purposes of Rule 11 that (i) a defendant's guilty plea be truly voluntary, and (ii) a complete record be produced at the time the plea is entered of the factors relevant to this voluntariness determination. *McCarthy*, 394 U.S. at 465, 89 S.Ct. at 1170, 22 L.Ed.2d at 424. *See also Dayton*, 604 F.2d at 931.

■ The indictment which was read charged Montoya (i) on or about October 9–10, 1979, met with citizens of Mexico, (ii) on or about October 11, 1979, with Cordero and a group of citizens of the Republic of Mexico, crossed the Rio Grande River into the United States, and (iii) walked with Cordero and the group of Mexican citizens from the Rio Grande to a brushy area near the intersection of Cordelia and UCO Streets in Del Rio, Texas, to constitute a violation of 18 U.S.C. § 371. In addition to this outline charged in the indictment, the Government informed District Court at the Rule 11 hearing of the factual basis to prove Montoya had (i) recruited aliens from various bars or hotels in the Plaza area of Ciudad Acuña, charging each $200–$350 to be brought into the United States, (ii) talked to Cordero about transporting aliens to Fort Worth, (iii) told Cordero he had some people ready to go to Fort Worth, (iv) agreed to furnish the transportation, and (v) agreed with Cordero to return to Ciudad Acuña where they would split the money. When specifically asked, Montoya admitted he knew he was helping the aliens cross the river in violation of the law.

On reviewing such facts, we conclude District Court was not clearly erroneous in reaching a subjective satisfaction Montoya (i) on or about October 9–11, 1979, formed and continued a conspiracy to transport aliens illegally, (ii) knowingly and willfully was a member of the conspiracy, (iii) committed the specific act of helping the aliens cross the river, and (iv) did so in furtherance of the object of the conspiracy. In so far as establishing that the facts which the government could prove would constitute the crime being admitted our determination would stand even if this Court credited Montoya's protest he lacked knowledge of the previous developments or other specific arrangements of the agreement prior to his meeting Cordero and the aliens at the river on October 11, 1979. Whatever such protestations might amount to concerning voluntariness, they did not require the Court to disregard the government's statement of the evidence showing the defendant's knowledge and participation in the protested activities.

Nor are our views altered when considered in light of Cordero's statements regarding Montoya's involvement in the arrangements prior to the night the river was crossed. First, a close reading of Cordero's statements don't completely negate Montoya's guilt. At the time of his arrest, Cordero informed the border agents Montoya had told him he had aliens available for trans-

---

**6.** *Dayton* reached the conclusion the test remains one of subjective satisfaction after reviewing the present formulation of the rule in comparison to the 1966 statement:

> As for investigating the plea's factual basis, the present formulation of the rule lays down a test that is less clearly subjective than that of the 1966 rule. All the same, it retains its clear reference to the trial judge's subjective satisfaction, and we conclude that this remains the test for that judge.

port. During the Rule 11 hearing, Cordero merely denied having a conversation with Montoya in Ciudad Acuña or telling Montoya anything about this business. Inasmuch as experience indicates in these illegal alien transportation cases one person recruits the aliens, another holds them and a third transports them, these statements by Cordero can be interpreted to suggest that although Montoya did not know the specific details regarding this case, he was holding aliens for another transport. This inference is supported by Montoya's admission during the Rule 11 hearing he knew he was helping aliens illegally cross the river. Second, Montoya heard Cordero deny his involvement in the incident. Yet, despite knowing evidence of these exculpatory statements was available to him at trial because District Court had explained to him his right to present evidence and witnesses to show his innocence, Montoya decided to plead guilty. In light of this knowledge, we can infer Montoya made a logical, reasoned decision to plead guilty to Count One rather than run the risk of being convicted and sentenced for all five counts.

Not only did District Court properly independently determine an adequate factual basis was presented on each element of the crime, but also fully complied with both voluntariness purposes of Rule 11. The record amply reflects, as evidenced by District Court's refusal at one point during the proceeding to accept Montoya's plea, due caution and diligence were exercised to assure Montoya's plea was entered voluntarily. Several times during the Rule 11 hearing, Montoya affirmatively stated his plea was voluntarily entered as he was guilty of helping the aliens cross the river. In asking the questions, District Court always addressed Montoya and Cordero separately. District Court never asked them jointly whether they either understood, affirmed, or refuted a question posed. A recess was taken during the Rule 11 hearing affording Montoya the opportunity to discuss with his attorney District Court's questions and the consequences of his plea. Throughout the whole proceeding District Court was patient, deliberate, and thorough in determining individually Montoya was voluntarily and knowingly entering his plea, and guilty of sufficient facts constituting a commission of the charged crime.

While an express admission of guilt is typically made by a defendant during a guilty plea proceeding, it is not a constitutional requisite to imposing a criminal penalty. *North Carolina v. Alford*, 400 U.S. 25, 37, 91 S.Ct. 160, 167, 27 L.Ed.2d 162, 171 (1970). "An individual accused of a crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.* Nor may any material difference be perceived between "a plea that refuses to admit commission of the criminal act and a plea containing a protestation of innocence when, as in the instant case, a defendant intelligently concludes that his interests require entry of a guilty plea and the record before the judge contains strong evidence of guilt." *Id.* The total record and the Court's findings show adequate compliance with Rule 11.

The Court was fully warranted in accepting the guilty plea.

AFFIRMED.