597 So.2d 627 (1992)
Dwight L. LOTT, Jr.
v.
STATE of Mississippi.
No. 89-KP-0525.
Supreme Court of Mississippi.
April 8, 1992.
Dwight L. Lott, Jr., pro se.
Michael C. Moore, Atty. Gen., Jo Anne M. McLeod, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
McRAE, Justice, for the Court:

I.
Dwight L. Lott, Jr., presently incarcerated in the Mississippi State Penitentiary, appeals from an order issued by the Circuit Court of Pearl River County on March 27, 1989, summarily denying his "Motion to Vacate Judgment and Conviction." He presents four issues for our review and decision. Only one merits discussion:
Did the court err in accepting his plea of guilty to the charge of murder because there was no factual basis of his guilt?
Finding that Lott's guilty plea was entered knowingly, voluntarily and founded upon an adequate factual basis, we affirm the decision of the Circuit Court.

II.

A. PROCEDURAL HISTORY
On May 5, 1988, after the State reduced the charge from murder as an habitual offender to murder, Lott entered a plea of guilty to murder less than capital in the death of Wendell Champagne, Jr. Thereafter, he was sentenced to serve a term of life imprisonment in the custody of the Mississippi Department of Corrections. The life sentence was to begin after Lott completed the sentences he was serving at the time of his plea.
On February 14, 1989, Lott filed a motion to vacate his plea of guilty on several grounds including the ground that there was no factual basis underlying the plea. He contends that his admissions amounted to guilt of nothing greater than manslaughter and that no other evidence of guilt was produced.
On March 28, 1989, the Circuit Court issued an order summarily denying post-conviction relief. After examining the record, the judge found as a fact "the movant did, in fact, freely, voluntarily, knowingly and intelligently [enter] his plea of guilty to the charge of Murder and that the case of Reynolds v. State, 521 So.2d 914 (Miss. 1988) is controlling in this instance." *628 The court concluded by stating that Lott was not entitled to any relief.

B. FACTS
On November 1, 1987, Lott and Wendell Champagne, Jr., began arguing while drinking at Champagne's house. Champagne grabbed a gun and the two fought over it. In the ensuing altercation, Lott ended up with the weapon and threw Champagne down a flight of stairs. Lott, brandishing a loaded gun, followed him to the bottom of the steps where they continued their brawl.
Lott repelled Champagne by hitting him with the butt of the gun. After hitting Champagne twice, he laid the gun aside. Champagne continued to pull himself up and fight. Each time Lott knocked him down again.
Champagne started across the parking lot to his truck. Lott, who thought that Champagne had a gun in his truck, positioned himself between Champagne and the truck. The two continued to fight. Eventually, Champagne was rendered semi-conscious. Lott then "passed out or went to sleep." He awakened an hour or two later and left without rendering any assistance, even though Champagne was moaning and Lott knew that he was "severely injured."

III.
This Court held in Sanders v. State, 440 So.2d 278, 283 (Miss. 1983), citing North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970), that "[w]here a plea of guilty has been intelligently and voluntarily entered, it is sufficient to undergird an unassailable final judgment of conviction."
There is nothing in the record to suggest that Lott was offered any hopes of reward for entering his plea of guilty, or that he was coerced, threatened or intimidated into making it. To the contrary, the circuit court interrogated Lott thoroughly and carefully explained to him the full gamut of constitutional protections available to him as well as the ramifications of entering a guilty plea. See, Sanders, 440 So.2d at 288. As mandated by Rule 3.03(2), Miss. Unif.Crim.R.Cir.Ct.Prac. (1990), a showing that the guilty plea was, indeed, made knowingly and voluntarily appears in the record. It indicates that the Circuit Judge followed to the letter the suggestions we made in Garlotte v. State, 530 So.2d 693, 694 (Miss. 1988) regarding the appropriate use of the summary disposition provision of Miss. Code Ann. § 99-39-11 (1972 and Supp. 1990).
As this Court recently observed in Corley v. State, 585 So.2d 765, 766 (Miss. 1991), "[o]ur focus is sharpened when we realize no law requires the accused admit his guilt before the court may accept his plea." In Reynolds v. State, 521 So.2d 914, 917 (Miss. 1988), relying on Alford, 400 U.S. 25, 38-39, 91 S.Ct. 160, 167-68, 27 L.Ed.2d 162, 171-172 (1970), we held that "admission of guilt is not a constitutional requisite of an enforceable plea."
We recognize, however, that a factual basis is an "essential part of the constitutionally valid and enforceable decision to plead guilty." Reynolds, 521 So.2d at 915. This factual basis cannot simply be implied from the fact that the defendant entered a plea of guilty. United States v. Briggs, 920 F.2d 287, 293 (5th Cir.1991). Rather, there must be an evidentiary foundation in the record which is "sufficiently specific to allow the court to determine that the defendant's conduct was within the ambit of that defined as criminal." United States v. Oberski, 734 F.2d 1030, 1031 (5th Cir.1984). Unless courts are satisfied that such a factual basis exists, they are admonished not to enter judgment on a plea of guilty. McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); United States v. Briggs, 920 F.2d 287, 293 (5th Cir.1991); United States v. Oberski, 734 F.2d 1030 (5th Cir.1984); United States v. Davila, 698 F.2d 715, 717 (5th Cir.1983); United States v. Jack, 686 F.2d 226 (5th Cir.1982). See also, United States v. Montoya-Camacho, 644 F.2d 480, 485 (5th Cir.1981) and United States v. Dayton, 604 F.2d 931, 938 (5th Cir.1979) (en banc).
*629 Even though Lott did not admit outright that the killing of his victim was malicious, we find, based on the evidence, that there was a more than adequate factual basis for the circuit court to accept his guilty plea. See, Reynolds, 521 So.2d at 917; Houston v. State, 461 So.2d 720 (Miss. 1984); Russell v. State, 428 So.2d 131, on remand, 428 So.2d 136 (Ala. 1982); United States v. Gaskins, 485 F.2d 1046, 1048 (D.C. Cir.1973); North Carolina v. Alford, 400 U.S. 25, 36-39, 91 S.Ct. 160, 167-68, 27 L.Ed.2d 162, 171-172 (1970). We think the record speaks for itself.
Q. [BY THE COURT]: Now, Dwight, on the first day of November, 1987, are you telling me under oath that you did commit the crime of Murder, and that is, you did with malice aforethought, feloniously, and without authority of law kill and murder one Wendell Champagne, Sr., here in Pearl River County, Mississippi.

A. Yes, sir.

Q. All right. Now, Dwight, you-all were at Mr. Champagne's house; is that correct?
A. Yes, sir.
Q. And, like I told you, your attorneys have prepared a defense in this matter. And through the motions, I would presume that the possible defense could have been self defense. I'm assuming that from the criteria of the motion. Do you understand thoroughly the doctrine of self defense; do you not?

A. Yes, sir.

Q. Now, do you understand by my accepting your plea of guilty to this crime of Murder, you are waiving having the defense of self defense; Do you understand that?

A. Yes, sir.

* * * * * *
Q. Now, Dwight, do you understand what "feloniously" and "willfully" and "with malice aforethought", do you understand that legalistic language?

A. I think I do.

Q. All right. Well, let's be sure. On the time that this incident occurred, to have self defense Mr. Champagne would have either done something to put you in fear of great bodily harm or possible death. And then you would have had the right to defend yourself at that time. That would be the defense of self defense. Do you understand?
A. Yes, sir.
Q. Did he do anything like that?
A. He did at one moment, but I guess the situation changed, though.

* * * * * *
Q. All right. Now, when he got hold of the gun and you got hold of the gun too, who ended up with the gun?
A. I did.
Q. Now, when you ended up with the gun, where was he?
A. He  I threw him down a flight of stairs. And I went down after him with the gun.

Q. Let me ask you this: When you threw him down a flight of stairs, did that injure him?

A. Yes, sir, I guess it did. And I hit him with the gun.

Q. All right. Well, let me ask you this: When he was at the bottom of the steps, were you still at the top of the steps?
A. No, sir. I went down the steps behind him.

* * * * * *
Q. And at that point in time, you were right behind him with a gun; is that right?
A. Yes sir.
Q. Now, you hit him with the gun?
A. Yes sir
Q. Was the gun loaded?
A. Yes, sir
Q. Did he try to stand up at that time or is he still on the ground?

*630 A. I hit him once and he got up and I hit him again. I hit him twice with the gun.

Q. All right. Then what happened?

A. He  I laid the gun down and he got up again. And I went at him with my fist.

Q. What happened then?

A. I kept knocking him down, telling him to stay down. I had him between my legs and kept hitting him with my fist.
Q. All right. What happened then?
A. Well, we fought all the way out to maybe ten foot fro the truck. And he finally stayed down. And I walked over and sat down under the camp at one of the stilts and watched him for probably fifteen minutes.
Q. Okay, And then what happened?
A. Well, I either passed out or went to sleep. I woke up an hour or two later. I walked upstairs with the gun, laid it up there on the rail. Walked down and got in my vehicle and left.
* * * * * *
A... . After I hit him the second time, he got up and I hit him right here (indicating) the first time. He started to get up again, and I hit him in the face with the butt of the gun. I thought he was down for good. I walked back to the stairs, and I laid the rifle down. And looked and he was getting up again, so I ran over there and got him between my legs and started hitting him with my fist before he could get up. And then we fought from that spot out to the truck out there where we was at.
Q. But you were on him at that point?
A. Yes, sir.
Q. When you say "fought" you meant you hit him until he stopped moving.

A. Yes.

* * * * * *
Q. All right. From that point that Mr. Garraway has just gotten the truck out, that's when he never did resist any further as far as 
A. Right.
Q. And then you continued to beat him at that point?
MR. DUCKER: [Defense Counsel]: You finished him off after he had really submitted, did you not, Dwight?

THE DEFENDANT: Right

THE COURT: (continuing)
Q. That's what I'm trying to get to. You understand, Dwight, when we go into this self defense, nobody wants you or anybody else to plead guilty to something you're not guilty of. That if it was self defense all the way through and he just died of injuries inflicted in self defense, then you would not be guilty of murder. Do you understand that?

A. Yes, sir.

Q. But we have to reach a point that the self defense ended and you continued to strike him, or we don't have murder. Do you understand that?
A. Yes, sir.
Q. All right. Did that happen? That's what I'm asking you.

A. I had  I guess I overdid it, Judge. I just kept, you know, I wanted him to stay down because I thought that the pistol was in the truck and he was headed in that direction. And I was knocking and knocking him trying to keep him down.

* * * * * *
Q. If I understand it then, what we're saying is that the last part of the situation, he really was not in any position to fight back?
A. Well, I hit him until he stayed still, Judge.

Q. That's what I mean. At some point, you could have quit and accomplished the same purpose?

*631 MR. DUCKER: When you knew he was down, you popped him another time or two; didn't you, Dwight?

THE DEFENDANT: Yes, sir.

MR. McDONALD: I think that was what he was talking about a minute ago, Judge, when he said he overdid it.

Accordingly, we concur with the Circuit Court's determination that Lott's claim that his plea of guilty was not made knowingly and intelligently and was devoid of a factual basis is without merit. Lott's motion to vacate his guilty plea without the benefit of an evidentiary hearing was properly denied. We therefore affirm the judgment of the lower court.
LOWER COURT'S DENIAL OF MOTION TO VACATE GUILTY PLEA AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER and PITTMAN, JJ., concur.
BANKS, ROBERTSON and SULLIVAN, JJ., dissent.
BANKS, Justice, dissenting.

I
Because the circuit court, despite substantial effort, failed to require or adduce a showing that a murder had occured, it erred in accepting Dwight Lott's guilty plea. It is elementary that there must be a factual basis for a plea of guilty. In my view none was shown here. I would reverse and remand for further proceedings.

II
The majority accurately sets forth the procedural history. Its statement of the facts is somewhat truncated, however. The facts are derived entirely from the testimony given by Lott at his guilty plea hearing. In order that this testimony be considered in context, it is set forth in an appendix to this opinion in its entirety. No other statement or evidence from which a factual basis for the crime of murder could be deduced is apparent in the record.
On November 1, 1987, Lott and Wendell Champagne, Jr., the alleged victim, were drinking when they began to argue. While they argued, Champagne grabbed a gun and an altercation ensued. He and Lott fought over the gun. Lott ended up with the weapon, as he threw Champagne down a flight of stairs. As Champagne fell down the stairs, Lott followed him because there was another gun located where Champagne "ended up laying at the bottom of the steps." Once at the bottom of the steps the two continued their brawl.
Lott, who described himself as five pounds lighter than his two-hundred forty pound co-combatant, repelled Champagne by hitting him twice with the butt of the gun. Lott stated that he believed the gun was loaded. Nevertheless, after hitting Champagne twice he laid the gun aside. Champagne continued to get up and fight and Lott, from that point, fought only with his fists.
Champagne continued to go towards his truck. Lott positioned himself between the stairs and the truck, because he had reason to believe Champagne had a gun in the truck. The two continued to fight. Lott stated there was not a moment during which he could retreat because Champagne "was in good shape until the fight was over," and was returning, if not initiating, the blows. Eventually, Champagne was rendered un- or semi-conscious. Lott then "passed out or went to sleep." He awoke an hour or two later and left.
Lott admitted, in response to leading questions, that Champagne was moaning and that he knew that he was "severely injured" and left without rendering any assistance. The record, however, does not denote the time or the cause of Champagne's death. Repeated efforts by the court and the state to have Lott admit to facts suggesting something other than self defense were to no avail. He said that Champagne was "in good shape until the fight was over" and that it was self defense "up until that time." The closest statement to an admission of culpability is Lott's sigh that "I guess I over did it" of which the state and the majority makes *632 much. In the very next sentences, however, Lott says "I just kept, you know, I wanted him to stay down because I thought that the pistol was in the truck and he was headed in that direction. And I was knocking and knocking him trying to keep him down."

III
Acceptance of a guilty plea by the trial court is a factual finding which we review on the clearly erroneous standard. Schmitt v. State, 560 So.2d 148 (Miss. 1990) See, U.S. v. Briggs, 920 F.2d 287 (5th Cir.1991); U.S. v. Dayton, 604 F.2d 931 (5th Cir.1979). The prerequisites for accepting a plea are set forth in the Rule 3.03, Mississippi Uniform Criminal Rules of Circuit Court Practice.
Rule 3.03(2) requires that a guilty plea be supported by a factual basis. It provides in pertinent part,
Voluntariness. Before the trial court may accept a plea of guilty, the court must determine that the plea is voluntarily and intelligently made and that there is a factual basis for the plea. (Emphasis supplied.)
Rule 3.03(2) mirrors its federal rule counterpart, Fed.R.Crim.P. 11(f) which states,
Determining Accuracy of Plea. Notwithstanding the acceptance of a plea of guilty, the court should not enter a judgment upon such plea without making such inquiry as shall satisfy it that there is a factual basis for the plea.
As Rule 3.03(2) is substantially similar to Rule 11(f), we not only premise our holding on our decisions, we find as persuasive authority decisions from the federal courts which have addressed the issue before us.
Courts are consistently admonished not to enter judgment on pleas of guilty unless satisfied that there exists a factual basis for the plea. McCarthy v. United States, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); United States v. Briggs, 920 F.2d 287, 293 (5th Cir.1991); United States v. Oberski, 734 F.2d 1030 (5th Cir.1984); United States v. Davila, 698 F.2d 715, 717 (5th Cir.1983); United States v. Jack, 686 F.2d 226 (5th Cir.1982) See also, United States v. Montoya-Camacho, 644 F.2d 480, 485 (5th Cir.1981) and United States v. Dayton, 604 F.2d 931, 938 (5th Cir.1979) (en banc) ("each essential element of the crime" must have a factual basis.)
Indeed, we have held that this factual basis is an "essential part of the constitutionally valid and enforceable decision to plead guilty." Reynolds v. State, 521 So.2d 914, 915 (Miss. 1988). A factual basis cannot simply be implied from the fact that the defendant has pled guilty. Briggs, supra, 920 F.2d at 293. An evidentiary foundation must appear in the record and "must be sufficiently specific to allow the court to determine that the defendant's conduct was within the ambit of that defined as criminal." United States v. Oberski, 734 F.2d at 1031 citing United States v. Davila, 698 F.2d at 717.

IV
To prove murder, the state must demonstrate that Lott, without authority of law and with "deliberate design to effect death," killed Wendell Champagne. Miss. Code Ann. § 97-3-19(1)(a) (Supp. 1991). Lott argues that there exists no where in the record any indication of evidence of the crime of murder, that is, that he acted with the deliberate design to effect Champagne's death.
After reading the record, one must agree. The transcript from the plea proceeding indicates no basis on which the court could conclude that there was a deliberate design to effect death. The record indicates that Lott and the decedent were continuously fighting until Lott prevailed by rendering the alleged victim either unconscious or semi-conscious with his fists. The court engaged in an extensive colloquy with Lott in a vain attempt to establish that the incident in question met the prerequisites for murder. The extensive interrogation is set forth fully as an appendix to this opinion. It should suffice, in summary, to observe that despite the efforts of the court and those of the prosecutor, Lott admitted to no conduct which went far beyond self-defense. His admissions certainly *633 did not surpass the crime of manslaughter.
Any unjustified or inexcusable killing without the deliberate design to effect death is manslaughter. Homicide is excusable under our law when committed by accident and misfortune, in the heat of passion upon sudden and sufficient provocation, or even when not accidental but "upon sudden combat, without undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel or unusual manner." Miss. Code Ann. § 97-3-17(b) and (c). Homicide is justifiable when "committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to ... do some great personal injury... ." Miss. Code Ann. § 97-3-15(f). Finally, even "unnecessarily" killing another "while resisting an attempt by such other person to commit any felony, or to do any unlawful act, or after such attempt shall have failed," is no more than manslaughter. Miss. Code Ann. § 97-3-31; Jones v. State, 98 Miss. 899, 54 So. 724 (1910).
Lott's conduct, as far as the record reflects, simply does not fall within the definition of the crime charged. United States v. Briggs, 920 F.2d 287 (5th Cir.1991). As the Supreme Court stated a number of years ago in McCarthy v. United States, 394 U.S. at 467, 89 S.Ct. at 1171, 22 L.Ed.2d 418 (1969).
The ... factual basis for a guilty plea must be precise enough and sufficiently specific to show that the accused's conduct on the occasion involved was within the ambit of that defined as criminal. Before a guilty plea can be validly accepted, the district court must insure that the conduct admitted by the accused constitutes the offense charged in the information. This factual basis must appear on the record. The purpose behind such a requirement is to protect a defendant who may plead voluntarily with an understanding of the nature of the charge but without realizing that his conduct does not actually fall within the definition of the crime charged.
The due process underpinnings of the requirements of Rule 3.03(2) are particularly apparent in this case. Lott pled guilty to a crime which requires a knowing and willful intent to kill, yet throughout the plea proceedings, his statements disclosed no support for such intent. He stated he and Champagne were engaged in a continuous struggle and they fought until the alleged victim was knocked out. Additionally, Lott had a loaded gun which he never fired. Surely this negates any inference of an intent to kill. Finally, there was no showing that Lott even knew that Champagne was dying or dead when he left.[1]
Nothing we said in Reynolds v. State, 521 So.2d 914 (Miss. 1988), or Brown v. State, 533 So.2d 1118 (Miss. 1988), states a position contrary to this position. Reynolds, like Lott, was questioned carefully by the trial court and when he "equivocated on his complicity in the crimes charged,"[2] the court questioned him more closely. The court below employed the same procedure with Lott. Reynolds, however, is distinguished from the case at bar, for in Reynolds, "the prosecutor offered a concise statement of facts to establish the crime, the investigation, and the apprehension of Reynolds." Reynolds v. State, 521 So.2d at 917. Here, except for Lott's statements, the record is silent.
In Brown v. State, 533 So.2d 1118 (Miss. 1988), before the defendant entered a guilty plea, the trial court conducted a hearing on his demurrer to the indictment. In addition to Brown's testimony, an investigator for the state testified at the hearing. A recess was taken, after which Brown filed a petition to enter a guilty plea "based upon the evidence the State intends to offer at trial." Id. at 1124. On appeal, *634 this Court held that the testimony in opposition to the demurrer provided a factual basis for Brown's plea of guilt, his assertions to the contrary notwithstanding.
Here, the record is devoid of any statements concerning proof which the State would have offered, if Lott's case proceeded to trial. Unlike the Brown Court, we cannot unequivocally state there was sufficient evidence adduced during the plea proceedings or in proceedings of record prior to the plea to support the court's finding a factual basis for Lott's guilt. A mere plea of guilty, without more, is insufficient to support an appellate court finding a factual basis for guilt. Reynolds v. State, 521 So.2d at 916.
This case is remarkably similar to that before the United States Court of Appeals for the Fifth Circuit in Briggs, supra. There Briggs collaterally attacked a guilty plea to defrauding a bank. She had caused wire transfers to be made from her employer's accounts to her own. The court examined the evidence before the district court and concluded that it was insufficient to constitute the crime of defrauding the bank because it was Briggs' employers who suffered the loss rather than the bank.
The majority unduly relies on the fact that no criminal defendant is constitutionally required to admit guilt before the acceptance of his guilty plea. North Carolina v. Alford, 400 U.S. 25, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970). While that is true, it is simply not the point here. That the factual basis for a plea need not come from a defendant's mouth does not mean that we can dispense with a factual basis entirely. Reynolds and Brown, supra, are but two instances where this court looked to other indications in the record to derive a factual basis. Here there is nothing save Lott's insufficient statements.

V
Lott's plea and the conviction based thereon should be vacated and this case remanded to the circuit court for further proceedings. It is not necessary to decide whether Lott may be lawfully convicted of murder. That, of course, depends on what, if any, evidence the state has. That evidence may or may not be sufficient to support a subsequent plea or jury verdict. I would hold only that the evidence before the court did not provide sufficient indication of a factual basis for a plea of guilty to murder. Under such circumstances the plea should not have been accepted.
ROBERTSON and SULLIVAN, JJ., join this dissent.

APPENDIX
(INDICTMENT IN CAUSE NO. 6014-1 READ TO THE DEFENDANT BY HONORABLE CLAIBORNE McDONALD, IV, ASSISTANT DISTRICT ATTORNEY, WHEREUPON THE DEFENDANT ENTERED A PLEA OF GUILTY TO THE CHARGE OF MURDER.)
THE COURT: All right. If you will retake the stand.
(DEFENDANT RETURNS TO WITNESS STAND)
THE COURT: (continuing)
Q. Now, Dwight, you just entered a plea of guilty to the charge of Murder; do you understand?
A. Yes, sir.
Q. All right. And do you understand that the sentence that this court has to impose on you is a sentence of life imprisonment?
A. Yes, sir.
Q. But since in your Petition to Enter a Plea of Guilty you have set out in this petition the fact that you have at least three prior convictions  and I believe that's really four. Correct?
A. Yes, sir.
Q. And because you are now serving a sentence with the Mississippi State Department of Corrections, you understand that if you persist in your guilty plea, the sentence that you're going to receive is life in the custody of the Mississippi State Department of Corrections, and that sentence to run consecutive to or begin after you completely serve all the sentences you are now serving. Do you understand that?
*635 A. Yes, sir.
Q. Now, Dwight, at this time if you want to, I will allow you to withdraw your plea of guilty. I'll enter a plea of not guilty for you and we'll proceed right on with the trial of your case as it has been set. Do you want to do that?
A. No, sir.
Q. Now, Dwight, has this plea of guilty been entered by you freely and voluntarily?
A. Yes, sir.
Q. Has it been your decision?
A. Yes, sir.
Q. Has anybody done anything by way of mistreatment, abuse, coercion, intimidation, threats, promises, or anything else to cause you to enter this plea of guilty?
A. No, sir.
THE COURT: Let the record show that the Court does sustain the motion of the State of Mississippi and reduces the charge to Murder thereby deleting from and amending the indictment in this matter, the charge as a habitual offender.
THE COURT: (continuing)
Q. Now, Dwight, on the first day of November, 1987, are you telling me under oath that you did commit the crime of Murder, and that is, you did with malice aforethought, feloniously, and without authority of law kill and murder one Wendell Champagne, Sr., here in Pearl River County, Mississippi?
A. Yes, sir.
Q. All right. Now, Dwight, you-all were at Mr. Champagne's house; is that correct?
A. Yes, sir.
Q. And, like I told you, your attorneys have prepared a defense in this matter. And through the motions, I would presume that the possible defense could have been self defense. I'm assuming that from the criteria of the motion. Do you understand thoroughly the doctrine of self defense; do you not?
A. Yes, sir.
Q. Now, do you understand by my accepting your plea of guilty to this crime of Murder, you are waiving having the defense of self defense; do you understand that?
A. Yes, sir.
Q. Now, I also notice in your Petition to Enter a Plea of Guilty, you stated you were drinking at the time of the offense. Now, were you so intoxicated or intoxicated to the extent that you did not know what you were doing?
A. No, sir.
Q. So, we don't have any problem of intoxication as being a possible defense?
A. No, sir.
Q. Now, Dwight, do you understand what "feloniously" and "wilfully" and "with malice aforethought" mean? Do you understand that legalistic language?
A. I think I do.
Q. All right. Well, let's be sure. On the time that this incident occurred, to have self defense Mr. Champagne would have either done something to put you in fear of great bodily harm or possible death. And then you would have had the right to defend yourself at that time. That would be the defense of self defense. Do you understand?
A. Yes, sir.
Q. Did he do anything like that?
A. He did at one moment, but I guess the situation changed, though.
Q. All right. Let me ask you this question: When you say he did at one moment, what did he do?
A. He went for a gun.
Q. All right. Did he actually get his hands on the gun?
A. We both got our hands on the gun.
Q. All right. Now, how big a person was Wendell Champagne?
A. I believe they said he was two hundred and forty pounds.
Q. And how big are you?
A. I'm about two thirty five.
Q. So, you-all are about equal in size?
*636 A. Yes, sir.
Q. All right. Now, when he got hold of the gun and you got hold of the gun too, who ended up with the gun?
A. I did.
Q. Now, when you ended up with the gun, where was he?
A. He  I threw him down a flight of stairs. And I went down after him with the gun.
Q. Let me ask you this: When you threw him down a flight of stairs, did that injure him?
A. Yes, sir, I guess it did. And I hit him with the gun.
Q. All right. Well, let me ask you this: When he was at the bottom of the steps, were you still at the top of the steps?
A. No, sir. I went down the steps behind him.
Q. But in other words, as he was falling down the steps, you walked down them behind him?
A. Yes, sir.
Q. Okay. What would have prevented you from staying at the top of the steps and letting him fall all the way down the steps?
A. Well, there was another gun downstairs.
Q. All right. Was that gun where he ended up laying at the bottom of the steps?
A. Yes, sir. It was to his right. And he had told me there was another gun behind the truck seat in the truck.
Q. All right. Let me ask you this, Dwight: What were you-all doing, drinking and then got into an argument?
A. Yes, sir.
Q. Now, at the time he hit the bottom though, he didn't have anything in his hand; di
A. No, sir.
Q. And at that point in time, you were right behind him with a gun; is that right?
A. Yes, sir.
Q. Was the gun loaded?
A. Yes, sir.
Q. Now, you hit him with the gun?
A. Yes, sir.
Q. Did he try to stand up at that time or is he still on the ground?
A. I hit him once and he got up and I hit him again. I hit him twice with the gun.
Q. All right. Then what happened?
A. He  I laid the gun down and he got up again. And I went at him with my fist.
Q. What happened then?
A. I kept knocking him down, telling him to stay down. I had him between my legs and kept hitting him with my fist.
Q. All right. What happened then?
A. Well, we fought all the way out to maybe ten foot from the truck. And he finally stayed down. And I walked over and sat down under the camp at one of the stilts and watched him for probably fifteen minutes.
Q. Okay. And then what happened?
A. Well, I either passed out or went to sleep. I woke up an hour or two later. I walked upstairs with the gun, laid it up there on the rail. Walked down and got in my vehicle and left.
Q. All right. From the time he laid down on the ground and you went back and sat down, did you try to administer any first aid to him?
A. No, sir.
Q. Did you try to check and see whether or not he was alive or dead?
A. No, sir. He was moaning over there when I was watching him.
Q. So, in other words, you sat there knowing he was pretty severely injured; is that right?
A. Yes, sir. Yes, sir.
Q. And you just allowed him to expire there and when you left possibly or whatever without getting him any aid or anything?
A. Yes, sir.
*637 Q. Now, Dwight, in the times that you hit him with the gun and so forth like that, and at the times that he was down, was it possible for you to have gotten in your vehicle at that time and left without causing him any further bodily harm?
A. I guess so, Judge. I sat down. I was wore out.
Q. I'm talking about, though, before you went that far. I'm talking about when he hit the bottom of the steps and you hit him with a gun. Was it possible at that time for you just to have left?
A. Not at that moment, no, sir.
Q. It wasn't possible for you to have held the gun on him or done anything other than defend yourself up to that point?
A. Would you rephrase that?
Q. Yes. What I'm trying to find out is: If you-all were in a fight at the top of the steps, and when he fell down the steps, you pursued him down the steps, up until that point, it might have been self defense. I'm trying to find out when the self defense was alleviated. In other words, when he didn't have something to threaten you with and you used a deadly force such as a gun or whatever to strike him with. When he was on the bottom of the steps, could you not at that time  with him being in the shape he was in  have gotten in your vehicle and left?
A. I was afraid to even try it then because the gun on the right  I didn't know  it wasn't loaded. But at that time, I didn't know that.
Q. You couldn't have picked the gun up and removed it with you?
A. Well, he said he had another gun in the truck too.
Q. I understand; but he wasn't in too good a shape at the bottom of the steps to be going and getting in a truck; was he?
A. Yes, sir. He was in good shape until the fight was over.
Q. So, you're saying that throughout the fight then that it was self defense up until that time; is that right?
A. Up until that time.
Q. All right. And then after that was over, what you're saying is that at a time that you knew he was in a life-threatening situation and possibly in a situation he would die, you just allowed him to die without doing anything to alleviate his situation. Is that correct?
A. Yes, sir.
Q. And you say that took some period  was he still alive when you left and drove off or do you know?
A. I don't know, Your Honor.
Q. You did not go back and check.
THE COURT: Mr. McDonald, is the State satisfied with those questions on the charge, or do you have information that needs to be 
MR. McDONALD:
Only one thing I want to clear up. It is my understanding that when Dwight was talking about him getting up, he was getting up on his knees. It wasn't like he was standing up fighting with Dwight at the bottom of the stairs. It wasn't that kind of situation.
A. He fell  when he fell, he hit face first. And he was coming up on his knees, getting up, when I hit him with the  I hit him on the right side of the head with the butt of the gun.
Q. At the times that you mentioned in your plea when you said "get up," you were talking about getting up on his knees. He never got up and fist-fought you again after he hit the bottom of the stairs?
A. Yes, he did.
Q. Except on his knees.
A. Yeah. After I hit him the second time, he got up and I hit him right here (indicating) the first time. He started to get up again, and I hit him in the face with the butt of the gun. I thought he was  he went down. I thought he was down for good. I walked back to the stairs, and I laid the rifle down. And I looked and he was getting up again, so I ran over there and got him between my legs and started hitting him with my fist before he could get up. And then we fought from that *638 spot out to the truck out there where we was at.
Q. But you were on him at that point?
A. Yes, sir.
Q. When you say "fought" you meant you hit him until he stopped moving?
A. Yes.
THE COURT: He wasn't striking you back; you were just hitting him until he finally went down?
THE DEFENDANT: He was striking me back.
MR. McDONALD: (continuing)
Q. When you got a-straddle of him, Dwight 
A. Yes, sir.
Q.  and you were beating him 
A. Yes, sir.
Q. That was it then, wasn't it? I mean, he wasn't in 
A. Well, he hit me. I had bruises on my neck, and that scar right there (indicating) is from where he had gotten me.
THE COURT: Earlier.
THE DEFENDANT: Pardon me?
THE COURT: Earlier.
THE DEFENDANT: From the  where he  from the bottom of the stairs on out.
THE COURT: All right. Well, what I'm saying is then 
MR. GARRAWAY: Let me talk a minute to my client. There's one segment that you-all haven't gotten into yet.
THE COURT: Well, if you need to ask him or whatever. I'm just trying to find out what happened.
MR. GARRAWAY:
Q. Dwight, after Mr. Champagne left the bottom of the stairs and started toward the truck 
A. Yes, sir.
Q.  you thought at that moment you had reason to believe he had a pistol in the pickup truck?
A. Yes, sir.
Q. Isn't that what you related to us?
A. Yes, sir.
Q. And then you went out between the stairs and the truck, and you stated previously that you got him between your legs and beat him again?
A. Right. Right.
MR. GARRAWAY: I wanted to get him positioned out away from the stairs, Judge.
THE COURT: All right. And then that would be away from the truck also?
THE DEFENDANT: Yes, sir.
MR. GARRAWAY: Yes, sir.
THE COURT: (continuing)
Q. All right. From that point that Mr. Garraway has just gotten the truck out, that's when he never did resist any further as far as 
A. Right.
Q. And then you continued to beat him at that point?
MR. DUCKER: You finished him off after he had really submitted; did you not, Dwight?
THE DEFENDANT: Right.
THE COURT: (continuing)
Q. That's what I'm trying to get to. You understand, Dwight, when we go into this self defense, nobody wants you or anybody else to plead guilty to something you're not guilty of. That if it was self defense all the way through and he just died of injuries inflicted in self defense, then you would not be guilty of murder. Do you understand that?
A. Yes, sir.
Q. But we have to reach a point that the self defense ended and you continued to strike him, or we don't have murder. Do you understand that?
A. Yes, sir.
Q. All right. Did that happen? That's what I'm asking you.
A. I had  I guess I overdid it, Judge. I just kept, you know, I wanted him to stay down because I thought that the pistol was in the truck and he was headed in that *639 direction. And I was knocking and knocking him trying to keep him down.
Q. I know, but what I'm talking about is where they mention that from the time you-all left the truck and it ended up out by the fence 
A. No. It ended up 
MR. GARRAWAY: It ended up between the stairs, Judge, 
MR. McDONALD: The stairs 
MR. GARRAWAY:  and the pickup truck.
A.  truck.
MR. McDONALD: About ten or fifteen feet.
MR. DUCKER: Dwight had blocked his entry to the vehicle. If he had enough consciousness to get to the truck, Dwight was in between him and the truck.
MR. McDONALD: On him.
THE COURT: (continuing)
Q. All right. But when you continued to beat him, was that in one spot or over 
A. Over a period of  of  ten or fifteen foot.
Q. Towards the truck or away from the truck?
A. Towards the truck.
Q. All right. And then where did he end up in relation to the truck?
A. He was, I guess, maybe five or ten foot behind the truck.
Q. So, from the steps, they did pass the truck?
MR. DUCKER: No, sir. Never got to it.
A. No.
Q. In other words, it all occurred from the steps  how far was the truck from the steps?
MR. DUCKER: Twenty-five feet.
Q. So, in other words, we're talking about fifteen feet from the steps and five feet from the truck?
MR. DUCKER: Something like that.
Q. If I understand it then, what we're saying is that the last part of the situation, he really was not in any position to fight back?
A. Well, I hit him until he stayed still, Judge.
Q. That's what I mean. At some point, you could have quit and accomplished the same purpose?
MR. DUCKER: When you knew he was down, you popped him another time or two; didn't you, Dwight?
THE DEFENDANT: Yes, sir.
MR. McDONALD: I think that was what he was talking about a minute ago, Judge, when he said he overdid it.
THE COURT: All right. Dwight, you may step down with your attorneys.
(DEFENDANT, MR. DUCKER, MR. GARRAWAY, AND MR. KEN FERRELL BEFORE BENCH)
(OFF THE RECORD DISCUSSION)
THE COURT: Mr. Ducker, and Mr. Garraway, let me ask you-all this. And let the record show who I've been conferring with is Ken Ferrell, who is the field officer for the Mississippi State Department of Corrections, who would normally prepare a presentence investigation and may in this case. Ken, of course, was supervising Dwight at the time this all occurred. And he is familiar with the two convictions in Pearl River County, but he's not familiar with the two convictions in Harrison County. So, his printout from the Department of Corrections does not include these two convictions.
Now, Dwight, are you now still having time on the two in Harrison County?
THE DEFENDANT: No, sir. I finished the Harrison County and I got  what it was, I had forged checks in Hancock County. I got five years down there, and it was running with this I got up here.
THE COURT: All right. So, you had one in Harrison and one in Hancock?
THE DEFENDANT: Hancock and 
MR. GARRAWAY: What was the conviction in Hancock?
THE DEFENDANT: Forgery. It ran concurrent with this up here.
*640 THE COURT: What was the one in Harrison?
THE DEFENDANT: Forgery.
THE COURT: And what happened to it?
THE DEFENDANT: I flat-timed that.
THE COURT: All right. And then you were on parole from Pearl River County?
THE DEFENDANT: Pearl River.
THE COURT: On what  on the Burglary charge?
THE DEFENDANT: On the Burglary charge.
THE COURT: And that was the one Judge Eubanks sentenced you on?
THE DEFENDANT: Yes, sir.
THE COURT: Do you want to just take the time out to check those sentences?
MR. FERRELL: However you want me to do it, Judge. I'm open to whatever you want to do.
(OFF THE RECORD DISCUSSION)
THE COURT: Let the record show, too: Dwight, have you understood everything I've asked you, all the questions and explanations, and have all your answers been true and correct?
THE DEFENDANT: Yes, sir.
THE COURT: Let me ask you this: Would you mind if Mr. Garraway went on to Lamar County while I let Mr. Ferrell check with the Department of Corrections to be sure we know exactly what their records show since we have in the petition three sentences; we know there are four. And I want to be sure that their records correlate to what we think they do. Let me do this: Do you mind if Mr. Garraway is not here for the sentencing because the sentencing will be 
(OFF THE RECORD DISCUSSION)
THE COURT: Let the record show the Court will accept what Mr. Lott has stated, and the sentence is life imprisonment in the custody of the Mississippi State Department of Corrections. And just in the event that there is a sentence pending that would turn up if I had a presentence done, then it is clearly understood that this life sentence will commence to run subsequent to, consecutive to, and will begin after any sentence that you now presently owe to the State of Mississippi or to any other state. Do you understand, Dwight, exactly what I'm saying to you? In other words, my intention is that you have a life sentence, but it's not to begin until you've served any and all sentences that you now presently owe, whether it be the State of Mississippi or any other state.
THE DEFENDANT: Yes, sir.
THE COURT: And then, Mr. Ferrell, if you will go ahead and check the record and then if Mr. Lott owes any sentences, then I want to be specifically informed of that and place that into his record with the Mississippi State Department of Corrections so that this order of the court can be carried out and that all sentences he's now facing or has any time left to serve on are served and completely served before he commences this life sentence.
And then the time you've been incarcerated, Mr. Lott, will not count on this sentence. And it's my understanding you are presently serving a sentence with the Mississippi State Department of Corrections; is that correct?
THE DEFENDANT: Yes, sir.
THE COURT: All right. So, I think the record now is abundantly clear.
Does the State accept that?
MR. McDONALD: Yes, we're satisfied.
THE COURT: All right. Then, you're back in the custody of the Sheriff of Pearl River County then to await transportation.
NOTES
[1] If, in fact, he was. It must be recalled that the record is bereft of information concerning the time and cause of Champagne's death. Lott apparently concedes that his actions had some causative effect in this regard, for he makes no argument on this point in his pro se pleadings. Whether he had sufficient information to knowingly make such a concession is unknown.
[2] See Reynolds v. State, 521 So.2d at 917.