# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2004-CT-00725-SCT

*EMMA HANNAH*


*v.*


*STATE OF MISSISSIPPI*

## ON MOTION FOR REHEARING

| | |
|---|---|
| DATE OF JUDGMENT: | 11/08/2004 |
| TRIAL JUDGE: | HON. C. E. MORGAN, III |
| COURT FROM WHICH APPEALED: | WINSTON COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | PRO SE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | DOUG EVANS |
| NATURE OF THE CASE: | CIVIL - POST-CONVICTION RELIEF |
| DISPOSITION: | REVERSED AND REMANDED - 10/19/2006 |
| MOTION FOR REHEARING FILED: | 08/09/2006 |
| MANDATE ISSUED: | |

EN BANC.

**COBB, PRESIDING JUSTICE, FOR THE COURT:**

¶1.     The State's motion for rehearing is denied. The previous opinions are withdrawn, and these opinions are substituted therefor.

¶2.     Emma Hannah pleaded guilty to manslaughter in the Winston County Circuit Court and was sentenced to serve twenty years in the custody of the Mississippi Department of Corrections. She subsequently filed a pro se petition for post-conviction relief which the trial

court denied. The Court of Appeals subsequently found she waived all claims by pleading guilty and affirmed the trial court. *Hannah v. State*, 2005 WL 949240 (Miss. Ct. App. 2005). Hannah now seeks relief before this Court through her pro se petition for writ of certiorari, in which she asserts that the trial court, as well as the Court of Appeals, erred by finding that: (1) she failed to prove ineffective assistance of counsel and (2) she knowingly, intelligently and voluntarily pleaded guilty. We granted her petition to independently review Hannah's two primary issues, which the Court of Appeals did not address.

## FACTS AND PROCEEDINGS IN TRIAL COURT AND COURT OF APPEALS

¶3. On December 11, 2002, the Winston County Circuit Court accepted Hannah's guilty plea to manslaughter in the June 8, 2001, death of her husband Winfred Hannah. Winfred died as a result of complications arising from an incident where boiling water was poured on him. On the day of trial, defense counsel informed the trial court that a plea would be entered by Hannah. After the usual colloquy, the trial judge announced that he would not accept the plea, after Hannah's statement that she "didn't do it." After a jury was seated and the parties announced ready to proceed, the court recessed. Following the break, defense counsel again informed the court that Hannah wanted to change her plea from not guilty of murder to guilty of manslaughter. The trial court then asked Hannah if she remembered all of the questions he had just asked, and when she answered affirmatively he proceeded with a short additional inquiry and accepted her plea. After a thorough sentencing hearing, Hannah was sentenced to the maximum time to serve, twenty years in the custody of the Mississippi Department of Corrections.

¶4.     From the time of sentencing, Hannah proceeded pro se.  Hannah first filed a petition for post-conviction relief in the Winston County Circuit Court which was denied.  However, that order was neither entered in the minutes of the court nor filed with the circuit clerk, and it is unclear from the record exactly what transpired with Hannah's motion.  The trial court later entered a substitute order denying Hannah's post-conviction relief.  She appealed to the Court of Appeals, which affirmed the trial court, without addressing the issues of ineffective assistance of counsel or the validity of Hannah's guilty plea.[1]  After our independent review of the record, with particular attention to these two issues, we conclude that she has raised meritorious arguments and should be allowed to proceed.  We reverse and remand to the trial court for proceedings consistent with this opinion.

---

[1]  In Hannah's pro se, handwritten brief to the Court of Appeals she enumerated the four issues for appeal which were addressed by the Court of Appeals. However, within the summary of her argument she also clearly alleged ineffective assistance of counsel and asserted that her plea was involuntary, issues not addressed by the Court of Appeals. Further, an unsworn affidavit which was attached to her brief also alleged ineffective assistance of counsel. Although ineffective assistance of counsel and the voluntariness of her guilty plea were not enumerated, the two unambiguous and explicit references in her 11 page brief were sufficient to have put the Court of Appeals on notice to consider these arguments. Miss. Code Ann. Section 99-39-27 (5) directs this Court and the Court of Appeals to study the entire record to determine whether the petitioner makes a substantial showing of a denial of a federal or state right. *Moore v. Ruth*, 556 So. 2d 1059, 1061 (Miss. 1990) (citing *Neal v. State*, 525 So. 2d 1279, 1280-81 (Miss. 1987); *Billiot v. State*, 515 So. 2d 1234, 1236-37 (Miss. 1987)). Where, as here, a prisoner is proceeding pro se, we take that fact into account and, in our discretion, credit not so well pleaded allegations, so that a prisoner's meritorious complaint may not be lost because inartfully drafted. *See Moore*, 556 So. 2d at 1061; *See also Haines v. Kerner*, 404 U.S. 519, 520, 92 S. Ct. 594, 596, 30 L. Ed. 2d 652 (1972); *Sanders v. State*, 440 So. 2d 278, 283 n.1 (Miss. 1983). Even though Hannah's brief was not professionally done nor perfectly organized in accord with M.R.A.P. 28, these two issues were before the Court of Appeals.

3

**ANALYSIS**

¶5.     In reviewing the denial of a petition for post-conviction relief we will reverse the factual findings of the trial court only if they are clearly erroneous; however, questions of law are reviewed de novo. ***Boddie v. State***, 875 So. 2d 180, 183 (Miss. 2004) (citing ***Brown v. State***, 731 So. 2d 595, 598 (Miss. 1999)).

### I.     INEFFECTIVE ASSISTANCE OF COUNSEL

¶6.     Hannah asserts that she received ineffective assistance of counsel, as to the plea as well as other underlying matters.  The United States Supreme Court adopted a two-prong standard for evaluating claims of ineffective assistance of counsel in ***Strickland v. Washington***, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  First, the convicted defendant must show that counsel's representation fell below an objective standard of reasonableness.  *Id*. at 687-88. Second, the defendant must show there is reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  *Id*. at 694.  This test applies with equal validity to challenges to guilty pleas.  ***Hill v. Lockhart***, 474 U.S. 52, 58, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985).

¶7.     As applied to the plea process, the focus of the first prong remains the same, while the second prong focuses on whether counsel's unprofessional performance affected the outcome. *Id*.  In the present case, Hannah must show that there is a reasonable probability that, but for counsel's errors, she would not have pleaded guilty, would have insisted on going to trial, and the outcome would have been different.  This Court has held that a reasonable probability arises

when the ineffectiveness is of such sufficient moment that the integrity of the proceeding or our confidence in the outcome has been shaken. *Leatherwood v. State*, 539 So. 2d 1378, 1385 (Miss. 1989).

¶8.     In *Myers v. State*, 583 So. 2d 174, 178 (Miss. 1991), this Court eloquently stated an appropriate backdrop to the current situation:

> The relationship of the accused to his lawyer provides a critical factual context here.  As he stands before the bar of justice, the indicted defendant often has few friends.  The one person in the world, upon whose judgment and advice, skill and experience, loyalty and integrity that defendant must be able to rely, is his lawyer.  This is as it should be.  Any rational defendant is going to rely heavily upon his lawyer's advice as to how he should respond to the trial judge's questions at the plea hearing.  He may also rationally rely on his lawyer's advice what the outcome of the plea hearing will be.  Yet it is the defendant, not the lawyer, who enters the plea.  It is the defendant, not the lawyer, who is going to serve the time.  It is the defendant, not the lawyer, whose constitutional rights are being waived at the plea hearing.  It is the defendant's plea and accompanying waiver of rights which under established law must be voluntarily and intelligently given, with full appreciation of the consequences to follow.

Hannah asserts that there were conflicting statements by the victim identifying his attacker as another woman to members of the burn center that treated him for his injuries.  In support of this claim, Hannah points this Court to medical reports in the record.  Also, Hannah claims that she received injuries earlier that evening which would have limited or defeated her physical capability to perform the acts required to commit the crime.  Hannah further asserts that there were other people, including the victim's girlfriend, in the house at various times prior to and at the time of the scalding.

¶9.     The second prong of *Strickland*, as it applies to guilty pleas, is whether the evidence likely would have changed the outcome.  *Hill*, 474 U.S. at 59.  The question now is not whether

5

Hannah is precluded from making this argument because she pleaded guilty. The question is whether the evidence and testimony, if properly investigated and presented, would have changed the outcome had the parties gone forward.

¶10. Such evidence includes the contradictory statements that the victim's girlfriend poured water on him. This evidence, set forth in the medical records, along with Hannah's testimony that someone else committed this act, is enough to raise a reasonable doubt that Hannah committed the offense. In the alternative, if defense counsel had presented the contradictory statements, delved further into Hannah's claims of prior abuse by the victim and of the abuse she says had taken place immediately prior to the incident, and asserted the intervening circumstances of the victim's death from respiratory failure, it is reasonable to conclude that the outcome of a jury trial may have been different.

## II.    VOLUNTARINESS OF HANNAH'S GUILTY PLEA

¶11. A valid guilty plea must represent a voluntary and intelligent choice by the defendant among the alternative courses of action available. *Hill,* 474 U.S. at 56 (citing *North Carolina v. Alford*, 400 U.S. 25, 31, 91 S. Ct. 160, 164, 27 L. Ed. 2d 162 (1970)). This Court has long held that there is no per se rule prohibiting a collateral attack on the validity of a guilty plea. *Baker v. State*, 358 So. 2d 401, 403 (Miss. 1978). However, we remain mindful of the strong presumption of validity that goes with solemn declarations made in open court and the need for finality. *Id*. The burden of proof is on the petitioner to prove that her plea was not voluntarily, knowingly and intelligently given. *Gardner v. State*, 531 So. 2d 805, 810 (Miss. 1988).

6

¶12. "A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment." **Boykin v. Alabama**, 395 U.S. 238, 242, 89 S. Ct. 1709, 1711-12, 23 L. Ed. 2d 274 (1969). Ignorance, incomprehension, coercion, terror or other inducements, both subtle and blatant, threaten the constitutionality of a guilty plea. **Boykin**, 395 U.S. at 242-43. This Court has crafted a series of warnings to ensure the voluntariness of a defendant's guilty plea. A defendant must be advised concerning the nature of the charge against her and the consequences of her plea including the minimum and maximum sentences that may be imposed. **Alexander v. State**, 605 So. 2d 1170, 1172 (Miss. 1992). The defendant must be told that her guilty plea waives several constitutional rights including her right to trial by jury, the right to confront adverse witnesses and the right to protection against self-incrimination. **Id**. *See also* **Boykin**, 395 U.S. at 243-44.

¶13. The present case presents an unusual challenge under these standards. After the trial court was first informed that Hannah desired to plead guilty to manslaughter, there was a plea colloquy. During the colloquy the trial court informed Hannah of her rights and the minimum and maximum sentences for the crime to which she was pleading guilty. The trial court ascertained that Hannah had discussed the nature of the charges against her and any defenses she might have with her attorney and what the State would be required to prove in order to convict her. The trial court also inquired as to whether she was sober at the moment, and whether she was coerced into pleading guilty.

7

¶14.    Lastly, the trial court asked the State to proffer its evidence.  The prosecutor read into the record the evidence against Hannah and the trial court followed with these questions:

> THE COURT: You've heard what the State would intend to prove if this case went to trial.  In other words, if we went ahead and had the trial today, that is what – [the prosecutor's] intentions would be to prove that.  Do you understand that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: You've heard what [the prosecutor] said.  Did you do you those things?
>
> THE DEFENDANT: I – no, I didn't.  But yeah, I heard what he said.
>
> THE COURT: You didn't do it.
>
> THE DEFENDANT: No.  I can't prove that I didn't do it.
>
> THE COURT: I can't take your plea.

The second time Hannah approached the trial court about pleading guilty to the charge of manslaughter, the following occurred out of the presence of the jury:

> THE COURT: . . . Miss Hannah, you know I went through the stuff before. Did you understand all that?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Would your answer be the same now as it was then?
>
> THE DEFENDANT: No.
>
> THE COURT: No.  No.  I mean all the stuff that I asked you before –
>
> THE DEFENDANT: Yes.
>
> THE COURT: – excluding the part about what [the prosecutor] said, would you answer that the same?

8

THE DEFENDANT: Yes.

THE COURT: You heard what he said he was going to prove if this case went to trial.

THE DEFENDANT: Right.

THE COURT: That you threw water on this man and he died because of it. Did you understand what he said?

THE DEFENDANT: Yes.

THE COURT: All right. Did you, in fact, do that?

THE DEFENDANT: Yes.

THE COURT: Are you pleading guilty to that – to the charge of manslaughter or the factual situation that he gave because you, in fact, are guilty of doing that?

THE DEFENDANT: Yes.

¶15. Voluntariness in the context of a guilty plea means voluntary in a constitutional sense. *Henderson v. Morgan*, 426 U.S. 637, 645, 96 S. Ct. 2253, 49 L. Ed. 2d 108 (1976). In *Henderson*, the Supreme Court acknowledged that "a plea cannot support a judgment of guilt unless it was voluntary in a constitutional sense." The Court found that a plea could not be voluntary in the sense that it constituted an intelligent admission unless the defendant received "real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Id*. (citing *Smith v. O'Grady*, 312 U.S. 329, 334, 61 S. Ct. 572, 85 L. Ed. 859 (1941)).

¶16. A factual basis for a plea may be established by the admission of the defendant, but the admission must contain factual statements constituting a crime or be accompanied by

9

independent evidence of guilt. *Reynolds v. State*, 521 So. 2d 914, 917 (Miss. 1988). This Court has held that a factual basis is not established by the mere fact that a defendant enters a plea of guilty. *Lott v. State*, 597 So. 2d 627, 628 (Miss. 1992).

¶17. Hannah's level of awareness and understanding during the plea colloquy is unclear. She merely answered "yes" to questions from the judge. When she faltered and said "no," the judge restated the question with little or no explanation. The record before us indicates that the trial court, at sentencing, had some evidence that Hannah committed the offense. Whether such evidence was sufficient is difficult to ascertain, particularly since Hannah continued to maintain during sentencing that she was not guilty and offered speculation as to who might have thrown the boiling water on the victim. See *Corley v. State*, 585 So. 2d 765, 767-68 (Miss. 1991).

¶18. This Court has said that it may look beyond the plea transcript to determine whether there was a factual basis for the charge. *Boddie v. State*, 875 So. 2d 180, 183 (Miss. 2004) (as to Boddie's argument that there was no factual basis for his guilty plea, this Court is not limited to the transcript of Boddie's guilty plea hearing, but we are allowed to review the record as a whole). Under the facts gleaned from the entire record, we conclude that there is some question whether the plea following the second colloquy was knowing, intelligent and voluntary. In viewing the entire record we can see additional facts discussed supra, which raise doubt as to the voluntariness of her plea.

¶19. Both colloquies happened on the same day and only hours apart. However, the information presented at the sentencing hearing raises doubt.

10

## CONCLUSION

¶20.    We hold that the voluntariness and knowledge of Hannah's guilty plea are in doubt. Further, we hold that she has raised a claim of ineffective assistance of counsel which requires a full evidentiary hearing. Therefore, we reverse the judgments of the Court of Appeals and the Winston County Circuit Court and remand this case to the circuit court for an evidentiary hearing and ruling on Hannah's claims consistent with this opinion and Miss. Code Ann. § 99-39-23 (Supp. 2005).

¶21.    **REVERSED AND REMANDED.**

**WALLER, P.J., DIAZ, GRAVES, DICKINSON AND RANDOLPH, JJ., CONCUR. SMITH, C.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY EASLEY AND CARLSON, JJ.**

**SMITH, CHIEF JUSTICE, DISSENTING:**

¶22.    Hannah filed a motion for post-conviction relief in the Circuit Court of Winston County raising three issues: (1) her guilty plea was not voluntary, (2) the assistance of her counsel was ineffective, and (3) there exists evidence requiring that her conviction be overturned. The trial court denied Hannah's motion for post-conviction relief on March 12, 2004. However, that order was neither entered into the minutes of the court nor filed with the circuit clerk. On November 8, 2004, the circuit court entered a substitute order denying Hannah's motion for post-conviction relief.

¶23.    Hannah subsequently filed an appeal, in which she raised four completely different issues: (1) the State erred in its investigation of the crime scene, thereby permitting the

11

destruction of evidence that could have exonerated Hannah as a suspect, (2) the trial court should have dismissed the charges against Hannah because the State failed to preserve certain samples of saliva and semen, (3) Hannah's due process rights were violated because the State suppressed certain evidence, thereby preventing Hannah from receiving a fair trial, and (4) her husband's death resulted from the medical treatment he received. The Court of Appeals affirmed the trial court's decision on April 26, 2005. The Court of Appeals did not consider whether Hannah's guilty plea was valid because she did not contest this issue on appeal. *Hannah v. State*, 2005 Miss. App. Lexis 292, 3 (Miss. Ct. App. 2005).

¶24. Hannah filed a petition for writ of certiorari with this Court on November 9, 2005. In that petition, Hannah returned to two of the issues she raised in her initial motion for post-conviction relief: (1) her guilty plea was not voluntary and (2) the assistance of her counsel was ineffective. Subsequently, this Court granted certiorari to independently review these two issues. Notwithstanding the majority's decision to independently review these issues, I would procedurally bar Hannah's claims because she failed to raise them before the Court of Appeals, thus denying it the opportunity to consider those claims. *See Lamp v. Iowa*, 122 F.3d 1100, 1104 (8th Cir. 1997); *Lowe-Bey v. Groose*, 28 F.3d 816, 818 (8th Cir. 1994); *Thigpen v. Thigpen*, 926 F.2d 1003, 1010 (11th Cir. 1991); *Frasier v. Maschner*, 2001 U.S. Dist. LEXIS 17124 (D. Iowa 2001); *McFarland v. Entergy Miss., Inc.*, 919 So. 2d 894, 904 (Miss. 2005). Procedural bar notwithstanding, I will alternatively consider the case on its merits. The majority would reverse and remand for a hearing. I disagree and therefore respectfully dissent.

12

## I. VOLUNTARINESS OF HANNAH'S GUILTY PLEA

¶25. Mississippi Uniform Rule of Circuit and County Court Practice 8.04(3) regulates the entry of guilty pleas:

> Before the trial court may accept a plea of guilty, the court must determine that the plea is voluntary and intelligently made and that there is a factual basis for the plea. A plea of guilty is not voluntary if induced by fear, violence, deception, or improper inducements. A showing that the plea of guilty was voluntarily and intelligently made must appear in the record.

This establishes the criteria Hannah must demonstrate to show her plea was not voluntary. Hannah argues that she "was not informed that her charges would be reduce [sic] to manslaughter, [sic] manslaughter instruction was not given as an option to murder nor was [sic] her theories as to what took place an option." Hannah also claims she was not given an opportunity to read the plea agreement, advised of the consequences of signing the agreement, or told the maximum and minimum sentence she would face for signing the agreement until the end of her trial. Hannah further claims that the court questioned her without informing her she was waving her constitutional rights. Hannah believes the trial court judge, her defense attorney, her mother-in-law, her sister-in-law, and the deputy who investigated the accident were all scheming against her. Hannah concludes her guilty plea "was obtained through misleading, underhanded compelling skills" by the circuit court judge. Hannah blames her attorney as well; she wrote in her motion for rehearing to the Court of Appeals that: "Counsel had craftily devised a way to get a ligitimate [sic] guilty plea out of the defendant without her knowing she had plead guilty."

¶26. However, Hannah was aware that the charge was reduced to manslaughter. The trial transcript reads:

> THE COURT: Do you understand that you are pleading guilty to manslaughter?
> THE DEFENDANT: Yes.
> . . .
> THE COURT: Are you pleading guilty to that – to the charge of manslaughter or the factual situation that he gave you, in fact, in fact, are guilty of doing that?
> THE DEFENDANT: Yes.
> . . .
> THE COURT: On the charge of manslaughter, how do you plead - guilty or not guilty?
> THE DEFENDANT: Guilty.

Furthermore, Hannah's argument that the "manslaughter instruction was not given" is without merit, no jury instruction was given because she pled guilty and the jury was dismissed. Likewise, Hannah's protest that she was not allowed to present her murder theory is without merit, she waived the right to present this theory by pleading guilty. *Jefferson v. State*, 556 So. 2d 1016, 1019 (Miss. 1989).

¶27. Hannah also claims she was not able to read the plea agreement, that she was not advised of the consequences of signing the agreement, and that she was not made aware of the maximum and minimum sentence she might face. However, her testimony during the plea plainly shows this is not true.

> THE COURT: Do you understand that there is no minimum sentence for this charge?
> . . .
> THE COURT: And a maximum sentence of 20 years. Do you understand that?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand there is no minimum fine but a maximum fine of $10,000?
> THE DEFENDANT: I didn't know all that.

14

THE COURT: Well, that is what it would be.  Do you understand that?
THE DEFENDANT: Um-hum.

Furthermore, Hannah's attorney stated that, while Hannah did not read the petition herself, he went over it with her, read it in its entirety, explained to her that she was pleading guilty to manslaughter, explained the minimum and maximum sentences, explained what the State would have to prove, and outlined the possible defenses Hannah might pursue.

¶28.　Hannah claims she was not informed that by pleading guilty she waived some of her constitutional rights.  However, the trial record demonstrates to the contrary:

> THE COURT: Before I can accept your plea of guilty there are certain constitutional rights which I must advise you of in which you would waive by entering a plea of guilty.  Do you understand you have the right to a public and speedy trial by jury?
> THE DEFENDANT: Yes, sir.
> THE COURT: Do you understand you have the right to call into court witnesses to testify for you?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand you have the right to cross–examine anybody that testifies against you?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand that you have the right to testify but that you also have the right not to?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand if you don't testify, I will tell the jury they can't hold that fact against you?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand you have a right to an attorney at all stages of the prosecution?
> THE DEFENDANT: Yes.
> THE COURT: Do you understand that I will instruct the jury that they must presume that you are innocent until such time as the State proves your guilt beyond a reasonable doubt?
> THE DEFENDANT: Yes, sir.
> THE COURT: Do you understand that all 12 jurors must find you guilty beyond a reasonable doubt before they can return a verdict against you?

15

THE DEFENDANT: Yes.

THE COURT: Do you understand if a jury were to convict you, you would have a right to appeal that conviction to the Mississippi Supreme Court?

THE DEFENDANT: Yes.

THE COURT: If you couldn't afford the cost of the appeal I will appoint an attorney to represent you and all the costs will be paid by the State.

THE DEFENDANT: Yes.

THE COURT: Do you understand you waive all those rights by entering a plea of guilty?

THE DEFENDANT: Yes.

THE COURT: Do you understand all those things I have advised you of, we are in the process of doing here today? Those things are available to you.

THE DEFENDANT: Yes.

THE COURT: Do you understand that you are pleading guilty to manslaughter?

THE DEFENDANT: Yes.

THE COURT: Have you discussed that with [your attorney]?

THE DEFENDANT: Yes.

THE COURT: Did he tell you what the State would have to prove in order to convict you of that charge?

THE DEFENDANT: Yes.

THE COURT: Did he discuss with you possible defenses that you might have?

THE DEFENDANT: Yes.

THE COURT: Also, did he discuss the charge of murder with you?

THE DEFENDANT: Yes.

THE COURT: Did he tell you what the State would have to prove in order to convict you of that charge?

THE DEFENDANT: Yes.

THE COURT: Did he discuss with you possible defenses you might have to that charge?

THE DEFENDANT: Yes.

The trial record reveals that Hannah was made well aware of the constitutional rights she waived by her guilty plea. The record also shows her plea was not "obtained through misleading, underhanded compelling skills" by the trial judge, who appears to have been genuinely concerned with the validity of her plea and her awareness of the situation; he even rejected the plea on her first attempt because of his concerns.

16

¶29. This Court held in *Smith v. State*, 636 So. 2d 1220, 1225 (Miss. 1994), that a defendant's claim that he blindly entered a plea of guilty on the advice of his attorney was not sufficient to render his plea involuntary. Thus, even if it were true that Hannah blindly followed the advice of her attorney when entering a guilty plea as she claims, her plea was still voluntary and valid.

¶30. In *Wilson v. State*, 577 So. 2d 394, 397 (Miss. 1991) (citing *Schmitt v. State*, 560 So. 2d 148, 153 (Miss. 1990)), this Court stated that a plea is voluntary if "the defendant knows what the elements are of the charge against him including an understanding of the charge and its relation to him, what effect the plea will have, and what the possible sentence might be because of this plea." In the case at bar, the trial record clearly demonstrates Hannah understood she was pleading guilty to manslaughter in lieu of a trial for murder, the minimum and maximum sentences for manslaughter, and the relation of the charge to her. Hannah's plea was clearly voluntary, and this issue is without merit.

## II. ASSISTANCE OF COUNSEL

¶31. " 'The benchmark for judging any claim of ineffectiveness [of counsel] must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.' " *Foster v. State*, 687 So. 2d 1124, 1129 (Miss. 1996) (quoting *Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). This involves a two-part test: (1) the defendant must demonstrate that his counsel's performance was deficient, and (2) that the deficiency prejudiced the defense of the

case. *Id*. (citing *Strickland*, 466 U.S. at 687; *Washington v. State*, 620 So. 2d 966 (Miss. 1993)).

¶32. In evaluating a claim of ineffective assistance of counsel, this Court "looks at the totality of circumstances to determine whether counsel's efforts were both deficient and prejudicial." *Osborn v. State*, 695 So. 2d 570, 575 (Miss. 1997) (citing *Carney v. State*, 525 So. 2d 776, 780 (Miss. 1988); *Read v. State*, 430 So. 2d 832, 839 (Miss. 1983)). Furthermore, "[t]here is a strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. (citing *Carney*, 525 So. 2d at 780; *Gilliard v. State*, 462 So. 2d 710, 714 (Miss. 1985)). "Only where it is reasonably probable that but for the attorney's errors the outcome of the trial would have been different, will this Court find that counsel's performance was deficient." *Id*. (citing *Dickey v. State*, 662 So. 2d 1106, 1106 (Miss. 1995); *Reed v. State*, 536 So. 2d 1336, 1339 (Miss. 1988)). In *Foster*, 687 So. 2d at 1130, this Court held that counsel's decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to the counsel's judgment.

¶33. In her motion for post-conviction relief to the trial court, Hannah claimed: (1) her counsel did not prepare a defense or review evidence and medical reports, (2) her counsel did not know that her husband had told his doctor that his girlfriend threw boiling water on him, (3) her counsel did not explain anything to her or talk to her about the plea, (4) she did not read the plea papers or know she was pleading guilty to anything, (5) her lawyer told her "to go in there

18

and say yes to everything the Judge [sic] ask [sic] even if you did not do it," and (6) that the trial judge "did not ask me did I understand the plea or ask me how I was pleading."

¶34. The decisions of Hannah's counsel fall within the ambit of trial strategy. Despite Hannah's claims and some remote possible inconsistencies, there was a mountain of evidence against Hannah. The prosecution stated on the record that it had "statements that [Hannah] made to officers and to family members of the victim, along with testimony from the sister and the mother of the victim, and specifically testimony from Dr. Hayne that the actual boiling water was the cause of death."

¶35. Hannah's story is hopelessly inconsistent. First, in her motion for post-conviction relief to the trial court, she claims that her husband's girlfriend threw the boiling water on him. Next, she claims that her husband's own mother threw the boiling water on him in a letter to trial court where she stated " I believe Winfred [sic] mother threw the hot water on him that morning." Finally, Hannah claims they both, independently of each other, threw boiling water on her husband in a supplemental letter to her original appeal, where she stated: "What we have is a victim who was scalded twice on the same morning on separate occasion." Hannah summarily concluded: "[t]hese two people scalded the victim and thats [sic] a fact." Hannah also tries to blame the doctors who attended to her husband for his death.

¶36. Mary Beasley Hannah, the victim's mother, testified her son called her between 6:15 and 7:00 AM and said "he called me and say [sic] momma, come see about me, say [sic] Emma have [sic] scalded me." Jewel Coleman, the victim's sister testified that "I guess around 6:00 in the

19

morning, about 6:10, the phone rang. My mother answered the phone. I heard her holler. I said momma, what's wrong, what's wrong. She said Winifred. She said Winifred say [sic] come see about me. Emma done [sic] scald [sic] me. We begun [sic] over there." Coleman further testified she didn't see any scars, bruises, cuts, or other injures and that Hannah did not complain of any. Coleman also saw Hannah pick up the empty pot with a pot lifter.

¶37. The prosecution stated that EMTs and a police officer were prepared to testify that Hannah had no injuries. The prosecution also stated that Hannah told a collection lady in Atlanta and also the victim's family that she was glad her husband died, along with telling people that the reason she threw boiling water on her husband was because she caught him in bed with another woman. Also, the prosecution stated that the deputy who responded to the crime said that Hannah was outside smoking a cigarette when she arrived, although Hannah claimed to have been in the house and accused the deputy, along with the victim's mother and sister, of lying.

¶38. As shown above, it is clear that Hannah's plea was voluntary. Her counsel likely as trial strategy advised her to plead guilty because of the wealth of evidence against Hannah and her lack of a clear, static alternative scenario. In my view, the advice of Hannah's counsel did not fall outside the realm of acceptable professional advice given the evidence amassed against her.

### III. FACTUAL ISSUES

¶39. Hannah repeatedly argues her guilty plea was not voluntary and is precluded by the facts. However, she fails to understand what this means. This Court previously stated:

> The institution of the guilty plea is well established in our criminal justice process. A guilty plea operates to waive the defendant's privilege against self-incrimination, the right to confront and cross-examine the prosecution's witnesses, the right to a jury trial and the right that the prosecution prove each element of the offense beyond a reasonable doubt.

*Jefferson v. State*, 556 So. 2d at 1019. A guilty plea waives any evidentiary issue or discovery violation. *Bishop v. State*, 812 So. 2d 934, 945 (Miss. 2002). By pleading guilty, Hannah waived the right to present alternate theories about her husband's death.

¶40. Hannah raises several factual issues: She claims the deputy who investigated the scene failed to check the house for other people and failed to check the bed to see if it was wet. Hannah also alleges the deputy did not confiscate evidence consisting of underwear, a towel, and cigarettes belonging to her husband's girlfriend. Hannah contends the only investigation took place 10 months later, after the house had been sold and all evidence removed. Hannah also claims her husband's mother saw the girlfriend's things and saw that the bed was not wet and insists "[s]he could not believe her son would have another woman there while I was there or maybe she wanted me out the [sic] way and she did it" in her motion for post-conviction relief to trial court. This is strange given her later claim that the victim's mother launched into a verbal tirade against her son before murdering him with a pot of boiling water. Nevertheless, these arguments are moot because Hannah voluntarily pled guilty; she waived her right to bring them before this Court and the prosecution has no way to respond because Hannah voluntarily ended the trial early.

21

¶41.    Hannah's vague story runs like this: Hannah went to her husband's house where he pushed her to the back part of the house.  He held Hannah at gunpoint for hours; during that time he tried to tear her clothes off.  After Hannah calmed her husband down, she went to get him some food in another part of the house.  During this time, Hannah claims to have heard name calling between her husband and another woman she determined to be Peaches Daniels, who she would later state was Linda Daniels, and saw her husband having sex with Daniels in the bathroom.  Hannah states that after two hours of sleep, she awoke to cook her husband shrimp and deer sausage for breakfast at around 5:00 AM in order to explain why she was boiling so much water so early in the morning.

¶42.    Further, Hannah contends her husband, after "getting drunk on moonshine and high on crack and pills all night with his friends,"[2] physically and sexually assaulted her between 5:30 and 6:00 AM with a broomstick.  Hannah retaliated in kind by pulling her husband's genitals and fleeing outside to hide in her husband's truck.  While outside, Hannah heard her husband yell.  She tried to re-enter the house but could not.  Within five minutes, her husband's mother and sister arrived to find Hannah outside wearing only a portion of her underwear.[3]  Hannah, but only in later filings, claims that her husband's mother went into the house and, while his sister

---

[2]   It is unclear who these friends are since it appears from Hannah's story that she and her husband, and possibly a girlfriend of his, were alone in the house all night.  Additionally, Hannah claims her husband was holding her at gunpoint, making it hard to comprehend how he was able to host a party and why there are not more witnesses.

[3]   Hannah has no explanation for why the victim's mother and sister arrived five minutes after Hannah left the house.  They contend they arrived because the victim called his mother and told her that his wife had just poured boiling water on him.

22

physically assaulted Hannah outside, she heard his mother say: "I can't believe I brought a child like you into this world. You don't do nothing [sic] but lie. I'm so sick of you, all time beating on that woman as good as she is to you and your children. Just look at you, you don't do nothing [sic] but lie, lie, lie. She can't do nothing [sic] to you but I will." This account is strange, given that in another filing Hannah stated of the victim's mother: "She could not believe her son would have another woman there while I was there or maybe she wanted me out the [sic] way and she did it." It is at this point Hannah indicates that her husband's mother poured boiling water on her own son, although she alleges his girlfriend also poured boiling water on him at some earlier point that morning, presumably after she ran out of the house. Hannah believes her husband's wife and sister then conspired to frame Hannah for the crime.

¶43. Hannah makes much of the fact that the consultation performed at Delta Regional Medical Center by Amita Patel, M.D., on June 15, 2001 states: "His girlfriend threw a pan of boiling hot water intentionally on him." However, the doctor did not state the source of this information, including if it was acquired from the patient. The discharge summary performed by Lawrence George, M.D., of the Delta Regional Medical Center on June 28, 2001 states: "Mr. Hannah was a 42 year old black male who received multiple burns after it was stated that his girlfriend threw a pan of boiling hot water over him while he was sleeping." This report was prepared after the patient's death, and once again it is unclear who reported the information about who threw the boiling water, or whether the information was simply copied from Dr. Patel's report. The majority quickly falls into acceptance of such statements as being made by the victim.

23

¶44. However, the record reflects only one clear reference to a statement made by the victim. The majority neglects to mention the Delta Regional Medical Center Inpatient Admission History / Assessment Form performed by the EMTs who responded to the scalding on June 8, 2001. In the section "REASON FOR ADMISSION (CHIEF COMPLAINT)" under "STATE IN PATIENT'S OWN WORDS" the EMTs had written: "pt states he was lying on couch asleep. Wife poured hot water on top of him." While the form also states that at least part of the information was given by her husband's mother, this seems to refer to other parts of the assessment such as history of illness, family history, patient education, current medications, home environment, and psychosocial history. This form clearly reports that Hannah's husband stated that it was Hannah who threw the boiling water on him, especially since the form indicates that the "pt states" it was his wife who poured the water. At no point do the medical records suggest that it was the victim's mother who poured the boiling water as Hannah continuously alleges.

¶45. The majority states that "Hannah asserts that there were conflicting statements by the victim identifying his attacker as another woman to members of the burn center that treated him for his injuries." However, the record reflects only the one statement by the EMT's attributed to the victim: "pt states he was lying on couch asleep. Wife poured hot water on top of him." There is no indication whatsoever of any "conflicting" statements actually made by the victim or if the victim even spoke to his doctors about who poured boiling water on him. The information in the discharge summary, given the victim was already dead when it was written, was most likely copied from an earlier report. That report provides no indication whatsoever

24

where the briefly jotted note came from or if it was simply a confused rumor passed from nurse to nurse.

¶46. The majority also states that " Hannah claims that she received injuries earlier that evening which would have limited or defeated her physical capability to perform the acts required to commit the crime." However, the majority fails to state what this evidence is. I find a single, blurry mugshot taken by the sherriff's department of Hannah, fully clothed, with a hand drawn arrow labeled "Shoulder Broken" is hardly convincing or persuasive evidence. Testimony by the victim's mother and sister also suggests Hannah was not injured the day of the murder. Additionally, the prosecution indicates that the EMTs and the deputy who were at the scene would have testified that Hannah was uninjured, explaining why she chose to plea down to manslaughter on the advice of her attorney in lieu of facing a lifetime sentence for murder.

¶47. Additionally, the testimony of the victim's mother and sister, who arrived at the scene and observed Hannah outside the house, does not support Hannah's story or the theory that Hannah did not commit the crime because she was not present. The victim's sister testified that Hannah was outside and "was just cool, calm and collected like nothing had happened." The victim's mother also testified that Hannah was outside and was calm. Neither indicated that Hannah was trying to enter when she arrived, and both indicate the window was broken long before that day. Their testimony is corroborated by what the prosecution indicates would have been the testimony of the deputy who responded to the 9-1-1 call; he would have testified that upon his arrival Hannah was outside calmly smoking a cigarette. Hannah casts doubt onto her

25

own story, as she testified that the deputy lied when he reported she was outside smoking calmly when he arrived, and claims she was in the hallway of the house. The testimony of the victim's mother, sister, and the impartial deputy all indicate that Hannah was not locked out of the house but instead burned her husband to death and calmly walked outside to smoke a celebratory cigarette, leaving him to call 9-1-1 and his mother for help.

¶48. Notwithstanding Hannah's version of the events, she waived these evidentiary concerns when she voluntarily pled guilty to manslaughter. As previously discussed, the trial judge made this clear when she entered her plea. Furthermore, the trial record suggests there was a large amount of evidence and testimony available to show Hannah's story was largely fabricated, including statements Hannah made to officers, to family members of the victim, the testimony of the sister and mother of the victim, the testimony of a doctor, and the EMT response sheet. I believe this evidence, along with Hannah's rambling, conflicting and incomplete story, explains why her attorney encouraged her to waive her rights and plead guilty to the lesser crime of manslaughter, thus avoiding the risk of life in jail as punishment for murder. The evidence from the trial record does not approach the level necessary to even suggest it meets the "clearly erroneous" standard of review. *Boddie v. State*, 875 So. 2d 180, 183 (Miss. 2004) (citing *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999)).

¶49. In conclusion, in my view Hannah's guilty plea was voluntarily entered and the trial judge made sure she was aware of the consequences of her choice. The advice of Hannah's counsel was well within the bounds of sound professional judgment as trial strategy since Hannah's story

was vague, incomplete, inconsistent, ever-changing, rambling and overwhelmingly negated by the evidence the prosecution stated it could produce at trial. Therefore, I would affirm the judgments of the Court of Appeals and the Circuit Court of Winston County.

¶50. I respectfully dissent.

**EASLEY AND CARLSON, JJ., JOIN THIS OPINION.**