ROBERTS, J„
 

 for the Court.
 

 ¶ 1. following her guilty plea in the Circuit Court of Tippah County to capital murder and aggravated assault, Judy Wil-banks was sentenced to concurrent sentences of life without the possibility of parole and twenty years, respectively, in the custody of the Mississippi Department of Corrections. She subsequently moved the trial court for post-conviction collateral relief, alleging that: (1) her plea was not voluntary; (2) her plea lacked a factual basis; and (3) she received ineffective assistance of counsel. The trial court granted Wilbanks an evidentiary hearing; however, the court ultimately denied her petition. Wilbanks now appeals and raises the same issues presented to the trial court. Finding no error, we affirm.
 

 FACTS AND PROCEDURAL HISTORY
 

 ¶2. After her indictment and arrest in 2001 for the shooting of Imogene Harden and killing of Jessie James Hardon, Wil-banks hired an attorney to represent her. However, upon becoming dissatisfied with her first lawyer, she fired him and hired Rob Laher to represent her. According to
 
 *754
 
 Wilbanks, Laher’s representation also left something to be desired. Nevertheless, on May 21, 2003, Wilbanks and Laher appeared before Judge Henry Lackey with the intention of entering guilty pleas. During the colloquy with the trial court, Wilbanks had a change of heart. Wil-banks stated that she could not plead guilty to something she did not do and requested that the trial court replace Laher as her counsel. Additionally, Laher requested that he be replaced as her counsel because he expressed concern as to his ability to adequately represent Wilbanks given certain letters written by Wilbanks that he had recently received through discovery from the State.
 
 [1]
 
 The trial court denied Wilbanks’s request for new counsel and set the trial for the following week.
 

 ¶ 3. The next day, May 22, 2003, Wil-banks was in court again to plead guilty to the charges against her, this time in front of Judge Andrew Howorth. At the conclusion of the trial court’s recitation of the consequences of pleading guilty, the second such briefing Wilbanks had received in the past two days, she pled guilty to capital murder and aggravated assault, and the trial court subsequently sentenced her. Approximately two years after her plea, Wilbanks filed a petition for post-conviction relief alleging that: (1) her plea was not voluntarily and intelligently entered; (2) she received ineffective assistance of counsel; and (3) there was no factual basis for her plea. The trial court granted Wil-banks an evidentiary hearing on her petition. Following the hearing, the trial court denied Wilbanks relief, and she subsequently filed the instant appeal.
 

 ANALYSIS
 

 ¶ 4. As with any denial of a petition for post-conviction relief, we will not disturb a trial court’s factual findings unless they are clearly erroneous.
 
 Moore v. State,
 
 986 So.2d 928, 932(¶ 13) (Miss.2008). Questions of law, however, shall be reviewed de novo.
 
 Id.
 

 I. WHETHER WILBANKS’S PLEA WAS VOLUNTARILY AND INTELLIGENTLY ENTERED.
 

 ¶ 5. Wilbanks argues that Laher coerced her into pleading guilty. She claims that Laher did not speak with her for some seven months after she retained him. This continued, Wilbanks alleges, until May 8, 2003, when Laher began visiting her in prison two to three times a week in an attempt to convince her to plead guilty. She claims Laher told her that she would be appointed an attorney to file her motion for post-conviction relief and, ultimately, her motion for a new trial. Additionally, she claims Laher told her if she pled guilty she would be able to receive visitors, but if she went to trial and was convicted, she would not. Further, Wil-banks claims that at the May 21, 2003, plea hearing Laher verbally assaulted her in retaliation to her failure to plead guilty. Finally, Wilbanks asserts that she answered every question asked during her May 22, 2003, plea hearing while looking to Laher’s purported visual cues for the correct response, and she did not pay any attention to the questions Judge Howorth asked.
 

 ¶ 6. “Before the trial court may accept a plea of guilty, the court must determine that the plea is voluntarily and intelligently made and that there is a fae-
 
 *755
 
 tual basis for the plea. A plea of guilty is not voluntary if induced by fear, violence, deception, or improper inducements.” URCCC 8.04(A)(3). While a defendant is free to collaterally attack a guilty plea, there is a strong presumption of validity to “solemn declarations made in open court.”
 
 Hannah v. State,
 
 943 So.2d 20, 25(¶ 11) (Miss.2006). To ensure that the requisite voluntariness and intelligence concerning the plea is present, the supreme court has mandated that the defendant receive certain warnings concerning his plea.
 
 Id.
 
 at (¶ 12). These warnings include being advised of the minimum and maximum sentences for the crime plead to and that the plea waives certain constitutional rights, including the rights to a trial by jury, to confront adverse witnesses, and protection against self-incrimination.
 
 Id. See also
 
 URCCC 8.04(A)(4)(b-c).
 

 ¶ 7. During the hearing on Wilbanks’s motion for post-conviction relief, she stated that she first became dissatisfied with her trial counsel after five months of unsuccessful attempts to contact him in order to discuss her case.
 
 [2]
 
 Wilbanks testified that Laher did not discuss her case with her until approximately two weeks prior to her trial date, and he never discussed any discovery pertaining to the charges against her. However, during cross-examination, she stated that he did mention some of the evidence the State had against her, but he did not go into any detail. According to Wilbanks, Laher visited her two or three times a week but only informed her that he had not had the time to prepare a defense, and he told her that her best option was to accept the State’s plea offer and to plead guilty. Wilbanks claimed that Laher told her that if she went to trial, she needed to “come up with something, some reason why you would have done this crime because, you know, I don’t have anything prepared.” She asserted that because of the above action and inaction by Laher she felt pressured to plead guilty.
 

 ¶ 8. Nevertheless, she rejected a plea offer in writing on May 8, 2003. Wilbanks stated that Laher subsequently contacted her family and pressured them to convince her to plead guilty. Soon after, on May 21, 2003, Wilbanks and Laher attended her first guilty plea hearing. At the conclusion of the trial court’s thorough recitation of Wilbanks’s rights associated with a plea of guilty, she stated: “I can’t do this. I’m sorry, but I didn’t do it. I can’t plead guilty to something I didn’t do.... Can I have another lawyer, please? This lawyer is not helping me. He’s the one trying to get me to do this. Oh, God.” The trial court explained that Wilbanks’s trial had been set for the following week for some time and denied her request.
 
 [3]
 
 Wilbanks testified that Laher visited her later that night and finally convinced her to plead guilty.
 

 ¶ 9. The next day, while she was waiting to attend her second plea hearing, Wil-banks claims that her doubts resurfaced, and she requested that she be allowed to call another attorney that she knew. Laher and Wilbanks called Charlie Brett. Wil-banks testified that she explained to Brett what Laher was trying to convince her to do; however, before Wilbanks could get a response, Laher “jerked” the telephone from her. Wilbanks claimed that Laher told her that Brett agreed with him. Brett stated by affidavit that he recalled
 
 *756
 
 the telephone call he received from Wil-banks and Laher. He stated that Wil-banks was very upset during the call and was troubled by Laher’s advice to plead guilty. He claimed that he never gave Wilbanks any advice other than telling her to consult with Laher.
 

 ¶ 10. According to Wilbanks, Laher told her that: (1) she would definitely get the death penalty if she went to trial; (2) it would be several years before she received an appeal; (3) she would never get to see her family again; and (4) she probably would not receive a new trial. Alternatively, if she plead guilty she would: (1) receive a life sentence, (2) be able to see her family, and (3) get a “fair trial” with a different lawyer upon filing a motion for post-conviction relief. Wilbanks then went before Judge Howorth and pled guilty to capital murder and aggravated assault. Wilbanks testified that Laher told her to look to him during the hearing for answers to the “routine” questions the judge was going to ask. She claimed that Laher did, in fact, instruct her on how to answer each of the trial court’s questions during the plea hearing by nodding or shaking his head to indicate whether she should give an affirmative or negative response. She stated that she pled guilty to get an “[attorney to go back to court, to get that trial. I mean, that’s the only way that [Laher] said I was going to get it would be to plea[d].” Wilbanks testified that if Laher had not pressured her as she described, told her she did not have any defense, and refused to do anything more for her case, she would not have pled guilty.
 

 ¶ 11. During cross-examination, Wil-banks repeatedly stated that she did not remember any of the questions or statements the trial court asked during her plea hearing. She claimed Laher told her to “tune the questions out” and just look to him for her responses. However, she testified that she remembered the rights explained to her during her first plea hearing. Wilbanks stated that Laher told her that these rights did not apply to her.
 

 ¶ 12. Ruby Brown is Wilbanks’s mother. She testified during the evidentiary hearing that she hired Laher after he contacted her three times seeking to represent Wilbanks. Brown stated that Laher never visited Wilbanks to discuss her case, and she was not aware of anything that Laher did during his representation of her daughter. Brown claimed that Laher stated that he did not have time to speak with potential witnesses or otherwise investigate Wilbanks’s case. She also testified that Laher pressured her to convince Wil-banks to plead guilty and routinely raised his voice when speaking with her. Brown stated that she did attempt to convince Wilbanks to plead guilty, but Wilbanks responded that she did not want to plead guilty to something she did not do.
 

 ¶ 13. Laher testified that he did not coerce Wilbanks into pleading guilty. During the evidentiary hearing, he maintained that given the amount of evidence against Wilbanks, it was his opinion, and advice to her, that her best option was to plead guilty. He testified that, contrary to Wilbanks’s assertion, he did not tell her what to say or how to answer the trial court’s questions during her guilty plea. During cross-examination, Wil-banks’s attorney at the evidentiary hearing questioned Laher as to his diligence in investigating a possible alibi for Wil-banks. Laher stated that, as far as he could recall, he followed every lead that was available at the time; however, he was confident that the end result of his investigation did not change his opinion that Wilbanks’s best option was to plead guilty. He stated that, in addition to the other evidence against her, the letters Wilbanks wrote to several potential wit
 
 *757
 
 nesses were very damaging to her case. He explained that although the letters did not explicitly request anyone to lie for Wilbanks, he was of the opinion that there was intent to coach the intended recipients on what to say. Furthermore, while Laher agreed with Wilbanks’s attorney that the letters could have been an innocent reminder to individuals that Wil-banks saw frequently, he stated that they began to conflict as time went on and new problems arose. That is, they changed over time to meet Wilbanks’s evidentiary needs. Finally, in response to Wilbanks’s attorney’s final question as to whether Laher “talked” Wilbanks into pleading guilty, Laher stated:
 

 I didn’t talk her into it. I laid out as best I could the facts, the likelihoods, the consequences. As I said before, there wei’e several times that she and I would go back and ftmth on evidence about should we do this, should we do that, on strategy, on to plea[d] or not plea[d]. Absolutely. That’s not uncommon in any case really; but as far as did I knuckle her under or anything like that, no, sir, I didn’t.
 

 ¶ 14. At the conclusion of the evidentia-ry hearing, Judge Howorth stated that while he did not remember Wilbanks’s guilty plea hearing with exacting certainty, he did remember Wilbanks pleading guilty because of the type of offense involved. Judge Howorth stated that defendants who plead guilty routinely look back at them attorney for one reason or another at some point during the plea; however, he said he was certain he never took a guilty plea of a defendant who looked back to their attorney for a response to every question. In such a situation, the judge stated, the plea would not be voluntary and the defendant’s plea would not be accepted. Finally, Judge Howorth stated that it was his recollection that although Wilbanks could have looked to her trial counsel once or twice, she did not look to her attorney for a response to every question.
 

 ¶ 15. The record shows that Judge Ho-worth advised Wilbanks of her rights and the consequences of pleading guilty. She stated under oath that she understood her rights, and that she understood that by pleading guilty she waived several of them. She also stated that she was not pleading guilty because of any promises, threats, or other inducements. Laher testified that he did not coerce Wilbanks into pleading guilty, but he only advised her of the possibilities given the evidence against her. We find that based upon the evidence in the record, Wilbanks’s plea was voluntarily and intelligently entered. As such, this issue is without merit.
 

 II. WHETHER WILBANKS RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.
 

 ¶ 16. The familiar two-prong test for evaluating a claim of ineffective assistance of counsel claim was established by the United States Supreme Court in
 
 Strickland v. Washington,
 
 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). First, it must be shown that a trial counsel’s representation fell below an objective standard of reasonableness.
 
 Hannah,
 
 943 So.2d at 24(¶ 6). Second, the defendant must demonstrate that there is a reasonable probability that, but for the trial counsel’s deficient performance, the result of the proceeding would have been different.
 
 Id.
 
 In the realm of a guilty plea, the inquiry remains the same as to the initial inquiry; however, as to the second, a defendant must show that they “would not have pleaded guilty, would have insisted on going to trial, and the outcome would have been different.”
 
 Id.
 
 at (¶ 7). In reviewing a claim of ineffective assistance of counsel, this Court “looks at the totality of circum
 
 *758
 
 stances to determine whether counsel’s efforts were both deficient and prejudicial.”
 
 Osborn v. State,
 
 695 So.2d 570, 575 (Miss.1997). Furthermore, “[t]here is a strong but rebuttable presumption that counsel’s conduct falls within the wide range of reasonable professional assistance.”
 
 Id.
 

 ¶ 17. Wilbanks alleges that Laher rendered ineffective assistance of counsel in failing to adequately investigate the charges against her, failing to confer with her concerning the charges, coercing her into pleading guilty, and giving her incorrect information regarding her plea and the post-conviction relief process. Wil-banks asserts that, but for Laher’s alleged errors, she would have not pled guilty.
 

 ¶ 18. The supreme court has stated that “in order to establish that failure to investigate a line of defense constituted ineffective assistance, a petitioner must show that knowledge of the uninvestigated evidence would have caused counsel to vary his course.”
 
 King v. State,
 
 503 So.2d 271, 275 (Miss.1987). When Wilbanks filed her motion for post-conviction relief, she failed to include any affidavits of individuals who would have testified in line with some defense to the charges to which she pled guilty. During her evidentiary hearing, she failed to call any witnesses who would have shed some light on “uninvestigated” evidence. Additionally, Laher specifically testified that he did investigate Wilbanks’s case and concluded that Wilbanks’s best option was to plead guilty. Further, Laher testified that he reviewed the State’s case against Wilbanks, and that he reviewed the case with her.
 

 ¶ 19. Wilbanks also alleges that Laher told her — as represented by a document in the record describing the pros and cons of pleading guilty as opposed to going to trial that was allegedly drawn up by Laher— that she would receive an attorney to represent her in her post-conviction relief proceedings if she pled guilty. However, the pro/con list in the record does not corroborate Wilbanks’s recollection. It shows that if she chose to plead guilty she could file a petition for post-conviction relief; it says nothing about her having any right to an attorney at that point.
 

 ¶ 20. Based upon the evidence above, and the testimony as summarized under Issue I, the trial court denied Wilbanks’s petition. In doing so, “[t]he trial court, sitting as finder of fact, appeared to have found the defense attorney to be the more credible witness!,] and it is not within our authority to substitute our own view on that question for that of the trial court.”
 
 Henderson v. State,
 
 769 So.2d 210, 214(¶ 13) (Miss.Ct.App.2000). Accordingly, we find that this issue is without merit.
 

 III. WHETHER THE RECORD CONTAINS A FACTUAL BASIS FOR WILBANKS’S PLEA.
 

 ¶ 21. As previously mentioned, prior to accepting a guilty plea, “the court must determine that ... there is a factual basis for the plea.” URCCC 8.04(A)(3). A defendant can establish a factual basis for his plea of guilty simply by pleading guilty; however, his plea “must contain factual statements constituting a crime or be accompanied by independent evidence of guilt.”
 
 Hannah,
 
 943 So.2d at 26-27. In other words, “a factual basis is not established by the mere fact that a defendant enters a plea of guilty.”
 
 Id.
 
 Rather, the record must contain those facts which are “sufficiently specific to allow the court to determine that the defendant’s conduct was within the ambit of that defined as criminal.”
 
 Lott v. State,
 
 597 So.2d 627, 628 (Miss.1992) (quoting
 
 United States v. Oberski,
 
 734 F.2d 1030, 1031 (5th Cir.1984)). Finally, this Court is not limited to review of a defendant’s plea transcript when determining if a factual basis existed for his guilty plea, but we may review the record
 
 *759
 
 as a whole for evidence of such.
 
 Boddie v. State,
 
 875 So.2d 180, 183(¶ 8) (Miss.2004).
 

 ¶22. During Wilbanks’s guilty plea hearing, the State made the following statement regarding the factual basis for Wilbanks’s plea:
 

 If this case were to go to trial, the State would intend to prove, and I think we would have the ability to prove the following facts among others; that the defendant, Judy Wilbanks, was the ex-wife of one, Jerry Wilbanks; that a portion of her life she had lived in Tippah County, Mississippi, but at the time of this incident, she was a resident of Savannah, Tennessee; that members of the family of her ex-husband, Jerry Wil-banks, lived on the land and property of the victims in this case, Jessie James Hardin and Imogene Hardin, Tippah County, Mississippi, Dry Creek, Tippah County, Mississippi; that the victim, Jessie James Hardin, was known to carry large sums of money on his person; that defendant left her home on August 17, 2001, from Savannah, Tennessee, to travel to Cole Auto Sales in Booneville, Mississippi. At that time, she was driving a purple Plymouth [Breeze] automobile that had the tag removed.
 

 Upon arriving at Cole Auto Sales, Booneville, Mississippi, she test drove a Ford Ranger - pickup truck; that she drove that Ford Ranger truck, to the home of Jessie James and Imogene Hardin to [the] Dry Creek community, Tip-pah County, Mississippi with the intent to rob and kill Jessie James and Imogene Hardin; that upon arriving at the home of Jessie James and Imogene Hardin, she entered the home under the pretext of looking for directions to some person’s house who did not live in the area. Upon entering the house of Jessie James and Imogene Hurdle [sic], pulled a .22 caliber pistol from a big, large purse or bag, at that time, she shot Jessie James Hardin on several occasions resulting in his death. She then turned and pulled the gun and shot Mrs. Imogene Hardin in the head with [sic] point blank range, leaving her for dead.
 

 She then took the money from the pocket of Jessie James Hardin and left the scene, returned to Cole Auto Sales and exchanged the Ford Ranger truck for her purple Plymouth Breeze [automobile].
 

 After this incident, her ham had been changed in color to a light brown or blonde color.
 

 Upon returning to Tennessee for the next couple of days, she [dyed] her hair to the normal color of a dark brown, black color; that the following day, she went to the courthouse in Savannah, Tennessee, and purchased a new tag for the purple Plymouth Breeze. She removed it prior to this incident; that the acts of the defendant, Judy Wilbanks, resulted in the death of Jessie James Hardin and serious bodily injury of Imogene Hardin and the robbery of the [sic] Jessie James Hardin; that after incarceration and arrest on each of the charges, the defendant sent numerous letters from the Tippah County Jail to persons on the outside requesting that they come and provide false alibis for her and offering to pay sums of money for services that they would have, your Honor. Those are the facts and statements of what we would have proved had it gone to trial.
 

 Wilbanks stated that she pled guilty to the above statement.
 

 ¶ 23. On appeal, Wilbanks argues that although the above statement was read into the record it does not establish a factual basis because there is “no direct evidence against [Wilbanks] and the circumstantial evidence allegedly available to the prosecution does not rise to the level needed for a criminal conviction.” However, “[t]he law is well settled that when
 
 *760
 
 properly entered and accepted, ‘[a] guilty plea operates to waive the defendant’s ...
 
 right that the prosecution prove each element of the offense beyond a reasonable doubt’
 
 ”
 
 Thornhill v. State,
 
 919 So.2d 238, 241 (¶ 13) (Miss.Ct.App.2005) (quoting
 
 Swift v. State,
 
 815 So.2d 1230, 1234(¶ 13) (Miss.Ct.App.2001)). Because we held above that Wilbanks’s plea was legally valid, we now hold that the State’s recitation of the facts it intended to prove is a sufficient factual basis for which to satisfy the constitutional requirements of Wilbanks’s plea. She cannot now call into question the sufficiency of the evidence against her as that right was waived upon her plea of guilty. This issue is without merit.
 

 ¶ 24. THE JUDGMENT OF THE CIRCUIT COURT OF TIPPAH COUNTY DENYING THE MOTION FOR POST-CONVICTION RELIEF IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO TIPPAH COUNTY.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE AND CARLTON, JJ., CONCUR.
 

 [1]
 

 . Although the letters were not made part of the record, it is clear from the testimony given during Wilbanks’s plea hearings and the evidentiary hearing that Wilbanks wrote several acquaintances of hers and told them to say she was at certain places at certain times. It appears from the record that the State viewed these letters as an attempt by Wil-banks to suborn perjury.
 

 [2]
 

 . Wilbanks wrote the Mississippi Bar Association two times during this period complaining of Laher's inaction.
 

 [3]
 

 . Wilbanks testified that immediately after this hearing, she and Laher met, and he yelled at her, called her names, told her she was a fool, and told her she was going to die.